### DENVER CITY TRAMWAY CO. v. NORTON et al.

### SAME v. FRENCH et al.

(Circuit Court of Appeals, Eighth Circuit. November 13, 1905.)

#### Nos. 2,140, 2,141.

1. TRIAL—CONSOLIDATION OF SUITS.

Where separate actions are brought by separate plaintiffs against the same defendants, pending in the same court, for personal injuries sustained in the same accident, depending upon the same evidence, with the only difference in the extent of the injuries to the respective plaintiffs, the causes, under section 921, Rev. St. U. S. [U. S. Comp. St. 1901, p. 685], are properly consolidated for trial.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, § 3.]

2. COURTS—JURISDICTIONAL AMOUNT.

Under the judiciary act the amount in dispute or matter in controversy, determining the jurisdiction of the court, is the amount demanded in the petition in good faith, and not the amount ultimately recovered.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, §§ 890–897.

Jurisdiction of federal courts as determined by the amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennent-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

3. APPEAL—REVIEW—JOINT ACTION AGAINST TWO DEFENDANTS.

In a joint action against a street car company and an omnibus company for personal injuries to a passenger, resulting from a collision at a street crossing, tried to a jury, with a verdict of not guilty as to the omnibus company and guilty as to the street car company, on writ of error sued out only by the street car company, no error committed by the trial court in favor of the omnibus company can avail the plaintiff in error, except in so far as it may have prejudiced the defense of the plaintiff in error in showing that the injury resulted from the negligence of the omnibus company without the concurring negligence of the plaintiff in error.

4. STREET RAILROADS—VEHICLES—RELATIVE RIGHTS.

While street cars and drivers of vehicles, equestrians, and pedestrians, as a general rule, have concurrent rights to occupy the public street crossings in a city, the right of the railroad at such point is superior, in the sense that it is preferential, as to the right of way.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Street Railroads, § 193.]

5. SAME—NEGLIGENCE OF MOTORMAN.

Facts reviewed as to whether or not the motorman was guilty of negligence in approaching a street crossing, and *held* to be a question for the jury.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Street Railroads, §§ 251, 253.]

6. SAME—SOUNDING OF GONG ON CAR PURSUANT TO CITY ORDINANCE.

Where a city ordinance requires the motorman of a street car on approaching a street crossing to sound a gong within 60 feet of the crossing, and the evidence tends to show that the gong was not so sounded, but that the driver of the coach approaching the crossing in fact saw the car more than 60 feet from the crossing, *held*, that the court erred in its charge in directing particular attention to the failure to give the signal as required by ordinance.

7. WITNESSES—INSTRUCTION—INTEREST OF PLAINTIFF.

Where the plaintiff in an action for damages on account of personal injuries testified to material facts respecting the character and extent of such injuries, and especially in contradiction of other witnesses, *held*, that the defendant was entitled to an instruction to the effect that while under the statute the plaintiff is permitted to testify in her own behalf, yet in considering such evidence the jury may take into consideration the fact that she is directly interested in the result of the suit. *Held*, further, that the duty to so charge is not met by a general instruction to the effect that the jury are the judges of the credibility of the witnesses and the weight to be given to the testimony of each.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, §§ 490, 493.]

8. SAME—CONTRIBUTORY NEGLIGENCE OF PLAINTIFF.

While the court does not assent to the proposition that in all given cases contributory negligence may not be attributed to a person riding in a vehicle with a driver, not the passenger's servant, yet, where the passenger is riding in a coach, the driver not being her servant or under her control, on a seat several feet from the driver and at an elevation of seven feet from the ground, *held*, that contributory negligence is not attributable to her for either failing to warn the driver of danger, or in not leaping from the coach under the circumstances.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Negligence, §§ 142, 143.]

9. DAMAGES—PERSONAL INJURIES—PERSONAL EXAMINATION OF PLAINTIFF.

In the federal jurisdiction, in an action for personal injuries, in the absence of some enabling statute of the state, the plaintiff cannot, by order of court, be required to submit to a personal examination by a surgeon. All the right the defendant in such instance has is to make request upon the plaintiff to consent to such examination, and in case of refusal the defendant should be permitted to disclose such refusal on the trial, and comment thereon to the jury, to the plaintiff's prejudice.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, § 924.]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Colorado.

Albert Smith (Charles J. Hughes, Jr., and Gerald Hughes on the brief), for plaintiff in error.

Horace N. Hawkins (Baldrige & De Bord, and Edmund F. Richardson, on the brief), for defendants in error, Norton and French.

William P. Malburn (Charles S. Thomas and W. H. Bryant on the brief), for defendant in error, Denver Omnibus & Cab Company.

Before SANBORN, Circuit Judge, and PHILIPS and CARLAND, District Judges.

PHILIPS, District Judge. On the 30th day of July, 1902, the defendant in error Anna C. Norton, a citizen of the state of Nebraska, and the defendant in error Mary B. French, a citizen of the state of Texas, were visiting in the city of Denver, Colo. In connection with a number of other persons, they hired of the Denver Omnibus & Cab Company, a tallyho coach, and rode out in the nighttime to a suburban hotel or resort, where they attended an entertainment. On returning to the city about 11:30 p. m., the said coach approaching on Logan avenue, at its intersection with Alameda street, was struck by a street car of the Denver City Tramway Company running on said Alameda street, whereby the coach was overturned and the said defendants in error received personal injuries. They brought separate actions, jointly against the two said companies, for damages. Over the objection of the plaintiff in error the two causes of action were consolidated by order of court for the purposes of trial. On trial to a jury, the jury returned a verdict in favor of the defendant the Denver Omnibus & Cab Company, and separate verdicts against the Denver City Tramway Company, assessing the damages in favor of the defendant in error Anna C. Norton in the sum of $1,200, and in favor of the defendant in error Mary B. French in the sum of $2,500. To reverse these judgments the said tramway company prosecuted writs of error to this court, citing the defendants in error and said omnibus and cab company. There are a large number of assignments of error on this record, but we will discuss only such of them as we deem material.

Complaint is made of the action of the court in directing a consolidation of the two cases for trial. The two actions grew out of the same accident, with the same defenses, and depended on the same evidence. The only difference being in the matter of damages dependent upon the extent of the injury sustained by the respective plaintiffs. Such a consolidation was clearly within the judicial discretion reposed in the court by section 921, Rev. St. U. S. [U. S. Comp. St. 1901, p. 685]. The incidents of the trial disclose no foundation for the contention that the trial of the two cases to the same jury operated injuriously to either party.

Error is assigned to the alleged action of the court, in impaneling the jury, in not allowing the defendant tramway company more than three peremptory challenges. This assignment must fail, for the reason that the bill of exceptions does not show what in fact was the action of the court in this particular, or that any exception thereto was saved.

It is also assigned for error that the court did not dismiss the action in the case of the defendant in error Anna C. Norton, on the ground that the amount really in controversy did not exceed the sum of $2,000, exclusive of interest and costs. The amount of damages sued for was $10,000. Under the judiciary act the amount in dispute or matter in controversy which determines the jurisdiction of the

circuit court in suits for the recovery of money is the amount demanded by the plaintiff in the petition in good faith, and not the amount ultimately recovered. Peeler v. Lathrop 48 Fed. 780, 1 C. C. A. 93; Ung Lung Chung et al. v. Holmes (C. C.) 98 Fed. 323. We cannot say, on this record, that the amount demanded by the plaintiff below was not in good faith. This must be so, where, had the jury rendered a verdict on the evidence for a sum exceeding $2,000, it could not be said there was not some evidence to support the verdict, although in the judgment of the court the sum found by the jury might be excessive.

As the verdict of the jury was in favor of the Denver Omnibus & Cab Company, and the defendants in error did not sue out any writ of error thereon, the judgment in its favor is not here for review. Only in so far as any misdirection of the court in respect of the liability of the omnibus company for the injury in question may relate to and affect the responsibility of the tramway company, is it important to consider the contribution of the driver of the coach to the accident. The two companies being sued as joint tort-feasors, if the negligence of each contributed thereto, they are jointly and severally liable for the damages. And as, in the absence of any statute changing the rule, there could be neither any apportionment nor contribution among the wrongdoers of the damages, the tramway company is not entitled to a reversal of the judgment on account of any error committed by the court in favor of the omnibus company, although it might appear that such ruling tended unduly to prejudice the defense of the tramway company.

It must be conceded, we think, that there was a failure in the court's charge to direct the attention of the jury to some most inculpatory acts of negligent omissions of duty on the part of the driver of the tallyho coach. A careful reading of his testimony tends to show that he entertained the idea that the sounding of the bugle, by the bugler on the coach, on its approach in the block next to the intersection of Logan and Alameda streets, was a sufficient warning to any street car that might be approaching said crossing of the coming of the coach; and that the duty was thereby laid upon the motorman of the street car to heed the approach of the coach, and to see to it that no collision occurred, even if it necessitated the stopping of the car to give the coach the right of way, notwithstanding the fact, as his evidence tends to show, he knew that his view for a considerable distance up Alameda street would be interrupted by a building near the corner of the two streets. When interrogated by counsel as to whether or not he stopped his coach, or got down himself or sent forward the bugler to reconnoiter to see if the way was safe, or whether he had any directions from the omnibus company in regard to crossing the car tracks, his answer was, "When you have a bugler they are supposed to blow the danger signal." And further on he said that he supposed the car would stop. The clear intendment is that he understood that in blowing the bugle he had performed his duty, so as to put the motorman on the defensive, and that he had a right to go heedlessly ahead onto the crossing, without more. The charge of the

court in this aspect of the case did not contradict clearly the notion of the driver. As if defining the sole duty of the coachman in this respect, the charge was:

If he "approached the place of the accident in a careful manner, slackening the speed of the horses and blowing the customary notes of warning on the horn, and when the horses were on the track the driver acted in the most careful manner possible under the circumstances—and when I refer to circumstances here, I refer to the condition of the street, the distance from the street to the car track—you cannot hold the defendant the Denver Omnibus & Cab Company liable for injuries received by its passengers in the accident. In other words, if the driver of the coach was a person of competent skill, and in every respect qualified and suitably prepared for the business in which he was engaged (and I think the evidence in this case shows that he was), and the accident in which his coach was overturned was not occasioned by any fault or want of skill on his part, but by the negligence of the other defendant, then the defendant the Denver Omnibus & Cab Company would not be liable for injuries sustained by a passenger. The car company, however, would be liable, if you find from the evidence the injury resulted from the failure of the motorman in charge of the car to exercise ordinary or reasonable care in the management of the car."

The minds of the jury were not specifically directed to the exercise of that vigilance and caution which the law imposed upon the driver in entering upon the railroad track. The law laid upon him, as the driver of a coach bearing passengers for hire, a high degree of care and circumspection to safeguard them from accidents. This is so much so that, where an accident occurs to the passenger during the carriage, the law makes it prima facie evidence of liability on the part of the carrier, and the burden of proof then shifts to the carrier to show the absence of negligence. Knowing, as the driver did, that his view up Alameda street was obstructed by the building on the corner; knowing, as he did, that he was handling 4 horses, drawing a coach filled with 17 people, extending over 30 feet along the street; and knowing, as he claims in his testimony, that on account of a ditch near the side of the street it would be impracticable for him to turn his horses up or down Alameda street upon the sudden approach of a street car—it was his plain duty to have approached that crossing in the exercise of the utmost vigilance and cautiousness. While the general rule in respect of the driver of a vehicle in approaching a railroad crossing, a known place of danger, to stop and listen where his view is cut off, may not generally apply to the use of such crossings in a city, yet, under the circumstances of this case, it was the driver's imperative duty, where, as his evidence tends to show, the heads of the lead horses would almost reach the railroad track before the car came into full view from his seat, to at least so slacken the speed and so slowly approach it that with his horses well in hand he could at once bring them to a standstill or turn them, in the event of the approach of a street car. On the contrary, his evidence is that he did not slacken the speed of the horses, but went in a jogging trot onto the track, so that it was impossible to have stopped the vehicle readily on the approach of the car. If he judged for himself that he could clear the track before the car reached him, and that was a reasonable judgment, how can the motorman be condemned if he, viewing the same situation, reached the same conclusion?

The plaintiffs themselves testified that they saw the car at least a half a block down Alameda street as it approached. As they sat on the rear seat of the long coach, from his position the driver, had he eagerly looked, as he was required to do, should have seen the car earlier, and necessarily before the lead horses reached the car track. If, then, he calculated that he could beat the car across the point of intersection and lost the race, he was nevertheless responsible to his passengers for his misjudgment. And it would have been for the jury to say, under proper instructions from the court covering the facts aforesaid, whether or not the driver's negligence did not occasion the injury without the concurring negligence of the motorman. On this state of facts the court instructed the jury as follows:

"A street car company operating its cars, with electricity or other motive power, upon the streets of a city, does not have the exclusive right to occupy the streets or its own tracks, and at a crossing of a street there is no prior or higher right in the street car company for the passage of its cars than there is for the passage of any other vehicle. Persons traveling along the street have the same right to cross the street that a street car has, and all persons at such crossings are bound to use reasonable care, to see that they get across without interfering with the rights of other parties."

While this declaration, abstractly considered, contains some legal truths, it was essentially misleading. It is true that a street car company, operating its cars with electricity, has not the exclusive right to occupy the streets for its own tracks. But it does have a prior right, in the sense of a preferential right of way, over a street crossing as against the pedestrian, the equestrian, and the driver of a vehicle. Regard must be had to the respective motive powers of the two occupants of the street, their relation to the public, and their means of more or less easily avoiding collision at such junction. A street car propelled by electricity or steam is a ponderous machine. It can only move on two rails in a direct line. It cannot be turned to either side to avoid a collision in front. Its very construction and the principle on which it operates are intended for rapid transit. It carries the public under demand that it proceed as rapidly as possible, having regard to the public welfare and safety. It cannot, therefore, be expected or required, every time it approaches a public crossing, to stop or check up and take observation as to the approach of vehicles, equestrians, and pedestrians before it can proceed. It has a right to proceed in the use of its tracks on the assumption that the drivers of vehicles and others approaching such crossings will take heed of the known hazards of such a place; the reasonable, usual speed at which such car runs, and the impossibility of its deflection from its single course, or of making a sudden stop.

In Davidson v. Tramway Company, 4 Colo. App. 283, 286, 35 Pac. 920, 921, the court said, in respect of the easement enjoyed by the railroad company, that:

"It is always conceded not to be exclusive, but is generally held to be superior. Whether or not this is an accurate description of their right, their privilege is undoubtedly a preferential one as against all other modes of locomotion along that part of the highway occupied by the track. This concession is absolutely essential to the preservation of the rights conferred by their franchise, the development of the objects for which they were organized, and

for the great benefit of a very large proportion of the population of the cities, which must make use of it for the purposes of business and travel. It is evident from the later decisions that the preferential use of the lines of their track by cable and electric companies closely proximates the right of exclusive use granted or conceded to steam railways. All the courts agree, however, that there still remains with the pedestrian, the users of vehicles and of horses, the old right which they always enjoyed—to use all of the King's highway at their pleasure and for their convenience. It is only insisted that they shall yield the track to the railway company, and shall keep out of the way of the cars so far as may be possible, barring the accidents of sudden emergency."

In Ehrisman v. East Harrisburg, etc., Railway Company, 150 Pa. 180, 24 Atl. 596, 17 L. R. A. 448, the court, speaking of the right of the general public in common with the railway company to use the crossing, said:

"While this common use is conceded and is unavoidable in towns and cities, the railway companies and the public have not equal rights. Those of the railway companies are superior. Their cars have the right of way, and it is the duty of the citizen, whether on foot or in vehicles, to give unobstructed passage to the cars. This results from two reasons: First, the fact that the car, cannot turn out, or leave its track; and, secondly, for the convenience and accommodation of the public. These companies have been chartered for the reason, in part, at least, that they are a public accommodation. The convenience of an individual, who seeks to cross one of their tracks, must give way to the convenience of the public. It would be unreasonable that a car load of passengers should be delayed by the unnecessary obstruction of the track by a passing vehicle."

In Wilson v. Minneapolis Street Railway Company, 74 Minn. 436, 77 N. W. 238, it was held that street cars are not confined merely to equal rights with the traveling public to use the track, but that "the necessary modifications of the general rule, growing out of the difference in the nature of the two classes of vehicles, such as the construction, motive power, mode of operation, and speed," must be taken into account. So it was said in Brown v. Wilmington Railway Company, 40 Atl. 936, 1 Pennewill (Del.) 332:

"It is the duty of the people using the highway in common with a street railway company to use reasonable care, stopping, and, if need be, turning out, and keeping off the tracks in the presence of danger."

The superior or preferential right of the street car company to the right of way was recognized in Clark v. Bennett, 123 Cal. 279, 55 Pac. 908; and also in Commonwealth v. Temple, 14 Gray, 69. It is to be conceded that while the street railroad company has this preferential right of way, it has no right to proceed upon the assumption that it may take no heed of the probability of encountering, at such crossings in a city, vehicles and the like, which have the right to use the crossing as a common highway. The motorman, in control of the operation of his car, must at all times, in approaching such crossings, proceed with such care and caution as, while subserving the public in rapid transit, he can reduce to the minimum the danger to others entitled to its contemporaneous use. The law of Colorado did not undertake to define the rate of speed at which a street car may run. It did exact of the motorman a degree of vigilance commensurate with the probable danger to others using the crossing at

that hour of the night. While the evidence in this case tends to show that at the time of night when this accident occurred this crossing was infrequently used by vehicles, and this fact should be taken into consideration by the jury in determining the question of the motorman's negligence, the fact that vehicles were liable to use the crossing at any time laid upon him the duty of keeping a lookout for their approach, and to so have his car under such control, with the appliances at his command, that he could stop it within a reasonable time to avoid collision with a vehicle driven with reasonable care.

We think that, under the facts and circumstances disclosed by this record, it was a question of fact to be submitted to the jury whether or not the motorman's negligence contributed directly to this injury. While the evidence on the part of the defendants in error tended to show that the car was running at a very rapid rate of speed, the judgment of the motorman was that he was not exceeding 12 miles an hour, and that he was running, within the regulation of the schedule time, at the customary rate at the time and place; and that he thought at the rate of speed he was running he could stop his car within about 40 feet. His testimony further is that when he first became aware of the approach of the vehicle he saw the heads of the lead horses as they emerged from behind the building. He did not know, and had no fact to excite an apprehension, that behind the leading horses were coming two other horses and a long tallyho coach. As the driver of an ordinary two-horse vehicle, if on the lookout, as he should be, might well be assumed to see the approach of the car, and therefore could either clear the track or check up or turn aside his horses, so as to avoid an accident, the motorman might not unreasonably proceed upon the assumption that the driver, in the performance of his duty, would keep out of the way. And therefore, until the situation of the vehicle became apparently such as to place the motorman under a reasonable apprehension of danger of collision, it was a question for the jury to determine whether the motorman was guilty of culpable negligence in not reversing the current and applying the brakes the instant he discovered the approach of the horses. The evidence does not show that the motorman had any knowledge of the presence of a ditch at the intersection of the two streets which might prevent the turning of the heads of the horses up or down Alameda street when the driver saw the car approaching.

There is another conspicuous fact in this case. The testimony shows, without contradiction, that at or near the street or block immediately next to the way the car was coming, it stopped to throw the switch and reverse the direction of the car, at which point the gong was sounded, and the car had to run only one block before it reached the point of accident. The rate of speed which the car gained in running the half block before it was seen by the driver necessarily could not have been very great, there being no special incline of the street towards the place of accident. The headlight of the car, as well as the lights in the car, were ablaze, affording the driver of the coach a much better opportunity to observe the approach of the car than the motorman had to observe the approach and position of the ve-

hicle. The driver was rather relying on his bugler, while the passengers, or some of them, were merrily singing.

It is true that the evidence shows the physical fact that after the collision the car ran about 60 feet before it was brought to a standstill, indicating a high rate of speed. The further physical fact appears that the horses and the entire coach, save the rear wheels, had cleared the track before the car reached the point, leaving it a debatable matter whether or not it was unreasonable for the motorman, up to the time he became aware of the imminence of the danger, to assume that the coachman was on the lookout and safely calculating that he would clear the track. The motorman furthermore testified that as soon as he discovered there was danger he put forth every appliance and exertion at his command to stop the car, and expressed the opinion that in about 4 feet further his car would have been brought to a standstill. In explanation of why his car traveled 60 feet after the collision, he testified that the contact with the coach broke the glass in the front of the car, pieces of which flew into and cut his face, when he fell backward, loosening his hold on the brake, which threw the force of the car against the reverse current and sent the car on by its own momentum. Whether or not this explanation was intelligent and satisfactory was properly a matter for the judgment of the jury. Kellegher v. Railway Co., 171 N. Y. 309, 63 N. E. 1096.

In its charge to the jury the court called attention to the ordinance of the city of Denver, which requires the motorman to sound the gong within 60 feet of the crossing; and the evidence tended to show his failure to do so. It refused the following instruction requested by the tramway company:

"You are instructed that the object of the ordinance requiring the ringing of a gong or bell is to give the drivers of vehicles and persons about to cross the track of the Denver City Tramway Company warning that the car is approaching upon said track, and if said driver or person about to go upon the track sees the car and knows of its approach as early as they would have known of such approach if the bell had been rung, then the reason or necessity for the ringing of the bell does not exist, and the failure to ring it cannot be the cause of the accident; and if in this case you find from the evidence that the driver of the vehicle and the plaintiffs herein saw and knew of the approach of the car as early as they would have known of it if the bell had been rung, as required by the ordinance, then you cannot find that the failure, if any existed, to ring the bell, was the proximate cause of the injury."

This instruction should have been given. The petition charged negligence "in not sounding a gong or bell or giving any other signal prior to reaching said crossing at said time, and plaintiff alleges that no gong or bell was sounded by the said defendant prior to reaching said crossing." The ordinance only required the sounding of the gong within 60 feet of the crossing. The sole purpose of this requirement is to give warning to persons about to enter upon such crossing of the approach of a car. When, therefore, it appears that the person approaching the crossing in fact saw the coming of the car beyond the 60-foot limit, he has all the notice and warning the sounding of the gong could possibly give. In such case no actionable negligence is predicable of the failure to sound the gong. When the reason of the rule does not exist the rule itself ceases to have any application.

Griffith v. Denver Tramway Company, 14 Colo. App. 504–515, 61 Pac. 46; Anderson v. Metropolitan Street Railway Company (Sup.) 61 N. Y. Supp. 899; Frank v. Metropolitan St. Ry. Co. (Sup.) 60 N. Y. Supp. 616; Smith v. Day et al. (C. C.) 117 Fed. 956; Langlois v. Dunn Worsted Mills (R. I.) 57 Atl. 910–911; Schulman v. H. W. S. & P. F. Ry. Co. (Super. Ct.) 36 N. Y. Supp. 439–440; Wood v. Pennsylvania R. R. Co. (Pa.) 35 Atl. 699–700, 35 L. R. A. 199, 55 Am. St. Rep. 728. The evidence of the plaintiffs themselves is that they saw the car from half to three-quarters of a block from the crossing, a block being 264 feet; and the driver testified that he saw it about 200 or 250 feet away. It is quite evident that it was prejudicial error for the court, under such circumstances, to direct special attention to the requirement of the ordinance and a failure of the tramway company to sound the gong within the 60 feet. The evidence of the motorman was that the gong was sounded as soon as he became impressed with the imminent danger of a collision.

The court refused to give the following instruction requested by the tramway company:

"You are instructed that in Colorado the plaintiff is by statute permitted to testify in her own behalf, but that in considering such evidence you are to bear in mind the fact that she is directly interested in the result of the action."

As the court gave no equivalent for this in its charge, we are of opinion that it was error to refuse the request. Section 858, Rev. St. U. S. [U. S. Comp. St. 1901, p. 659], simply declares that:

"In the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party to or interested in the issue tried."

It leaves such party, when he does testify, still subject to the common-law rule of having his testimony weighed by the jury in the light of his interest in the case, and to what extent that interest may affect his credibility. It is not only proper and usual for the trial court to direct attention to such fact (Stewart v. Kindel, 15 Colo. 539, 25 Pac. 990), but in this case the tramway company was entitled to such instruction. The plaintiffs were claiming damages for personal injuries which were more or less occult, the character and extent of which depended much upon the testimony of the plaintiffs. More than that, in the case of the defendant in error Mrs. French, when on the witness stand she was interrogated as to whether or not she had not been treated or operated upon for some internal disorder prior to this accident. The inquiry bore directly upon the matter in issue as to whether her present disability was traceable wholly to the injury complained of, or whether it might not, at least in part, be traced to an antecedent infirmity. The court, on objection of her counsel, refused to compel an answer. It is true that this error was measurably cured by allowing the plaintiff in error afterwards to read the deposition of the surgeon who had treated and operated upon her. The plaintiff in error was entitled, however, in the first instance, to have her answer the question, so that, if she had denied the fact, her contradiction by the deposition of the surgeon might have subjected her testimony to a general discredit by the jury. After the surgeon's

deposition was read she again took the stand, and, in many material respects, contradicted the testimony of this surgeon. Under such conditions, the plaintiff in error was entitled, as a matter of justice, to have the attention of the jury drawn directly to her personal interest in the result of the case, as affecting her credibility, as it bore upon the important issue of the amount of damages. While the court, in a general way, told the jury that they were the judges of the credibility of the witnesses, and the weight to be given to the testimony of each, this did not sufficiently invite the attention of the jury to a consideration of the witness' special interest in the verdict. Chicago & Grand Trunk Railway Company v. Spurney, 69 Ill. App. 551.

The tramway company complains of the charge of the court which, in effect, advised the jury that, as the defendants in error had not control of the coach or the driver, no contributory negligence was imputable to them for the act of the driver in going upon the street car track in front of the car. Without assenting to the proposition, as a general rule, that contributory negligence may not be attributed to a person riding in a vehicle with a driver not the passenger's servant, as applied to the facts of this case there was no basis for attributing to either of the plaintiffs any negligence contributing to the injury. They were riding on the rear seats of the coach, four seats back of the driver. They were not directing the movements of the coach. They did not apprehend any unusual danger until the car was so near as to have rendered unavailing any warning they might have given the driver. The seat on which they were riding was elevated about seven feet above the ground. Any attempt, therefore, by them to leap from their perch, might, and probably would, have been more disastrous to them than to retain their position. No matter, therefore, how broad or favorable the charge of the court respecting the rule of contributory negligence, no injury resulted therefrom to the plaintiff in error.

Complaint is made of the ruling of the court in the progress of the trial in refusing the request of the plaintiff in error to permit it to have the defendants in error examined by a surgeon of its selection or by indifferent surgeons selected by the court. Before the conclusion of the trial, however, counsel for defendants in error consented in open court to submit their clients to such examination. Under the ruling of the Supreme Court in Union Pacific Railway Company v. Botsford, 141 U. S. 250, 11 Sup. Ct. 1000, 35 L. Ed. 734, and Camden, etc., Railway Company v. Stetson, 177 U. S. 173, 20 Sup. Ct. 617, 44 L. Ed. 721, it is held that in an action for personal injuries, in the absence of some enabling statute of the state, the plaintiff cannot by order of court be required to submit to a personal examination by any surgeon. All the right the defendant has in such instances is to make the request upon the plaintiff to consent to such examination, and in case of refusal the defendant should be permitted to disclose such refusal on the trial and comment thereon to the jury to the plaintiff's prejudice. Turquand v. Strand Union, 8 Dowling, 201; Bryant v. Stilwell, 24 Pa. 314, approved in Union Pacific Ry. Co. v. Botsford, 141 U. S. 254–255, 11 Sup. Ct. 1000, 35 L. Ed. 734.

141 F.—39

It results that the judgments against the plaintiff in error must be reversed, and the causes remanded for new trial in conformity with this ·opinion. The writs of error sued out against the Denver Omnibus & Cab Company are dismissed, at the cost of the plaintiff in error.