## CHICAGO GREAT WESTERN R. CO. v. BIWER.

(Circuit Court of Appeals, Eighth Circuit. August 7, 1920.)

No. 5548.

Railroads ⬡⟳328(2)—Automobile driver, whose view was obstructed, held negligent in not stopping to listen.

An automobile driver who approached a crossing where the view was obstructed, without stopping his car to listen, and was struck by a train whose approach he did not hear, though its rumbling was heard by numerous witnesses at greater distances, was contributorily negligent as a matter of law.

In Error to the District Court of the United States for the Northern District of Iowa; Henry T. Reed, Judge.

Action by Leo Biwer against the Chicago Great Western Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with directions to grant new trial.

Fred P. Carr, of Des Moines, Iowa, George T. Lyon, of Dubuque, Iowa, and Clifford V. Cox, of Des Moines, Iowa, for plaintiff in error.

M. E. Geiser, of New Hampton, Iowa (Lee Elwood, of Elma, Iowa, and Hurd, Lenehan, Smith & O'Connor, of Dubuque, Iowa, on the brief), for defendant in error.

Before CARLAND and STONE, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge. The plaintiff in error assigns the refusal of the trial court to direct a verdict in its favor as error, based upon the contention that the plaintiff below was guilty of negligence as a matter of law in (1) approaching the point of collision at a rate of speed of 8 to 12 miles per hour; (2) failing to still the noise of his automobile, so that he could have heard the approaching train.

The plaintiff in error invokes the application of the familiar rule —stop, look, and listen before going upon a railroad track at a highway crossing. The defendant in error claims the facts take the case out of the rule, or at least that the matter of the negligence of the plaintiff below was for the jury.

The plaintiff below owned and operated a garage in the town of Elma, Iowa. The garage was about 200 feet a little north of east of the railroad crossing. The garage faces west on Busti avenue. The line of railroad of the defendant company runs through the town in a slightly northwesterly and southeasterly direction. At the cross-

---

ing there is a switch track immediately east of the main line. A few feet north of the crossing east of the main line there are two switch tracks. Of these two switch tracks, the east track is called the loading track, and the west track is called the cut-off track. There is a platform east of the loading track, about 200 feet north of the crossing.

At the time of the accident a freight car was standing on the cut-off track just beyond the frog of the two switch tracks, probably about 70 feet from the crossing. One, perhaps two, freight cars were standing on the loading track in the neighborhood of the platform. The exact number of cars on the switch tracks at the time of the accident, in the vicinity of the platform and north of the crossing, is in dispute. Whatever the number, they were sufficient to cut off the view of the main line north of the car near the switch frog, except at one point referred to by the plaintiff in his testimony, and also by other witnesses in their testimony. Immediately north of the platform and east of the loading track were some coal sheds and a cement house, extending north probably about 100 feet, which obstructed a view of the main line from the east side.

Omitting immaterial matter and repetition, plaintiff testified in his own behalf substantially as follows:

I lived at Elma, Iowa, in April, 1917. I was doing a livery business at that time. Mr. Oldham came and asked me to take him out west of town. I started out with him in an Overland car. It was in good condition. Mr. Oldham got into the car, and I backed out of the garage to the north, and came around to the south, before I turned west and started to drive towards the railroad crossing. I looked to the south, to see if things were clear. I could see the tracks for half a mile or so, and there were no trains in sight. As I drove towards the crossing, I kept looking to the north. I paid attention to see whether or not a train was coming. After I had started towards the railroad track, there was one point where I could see between the cars across the track. That point was probable a couple of hundred feet north of the railroad crossing. There was no train on the main track at that time. As I drove on further, I kept watching, and when I got close up I began to listen. North of the crossing there were box cars. Before I started away from the garage, I didn't know that my view would be obstructed. As I was 10 feet or so away from the main track, this train shot out from behind a box car. When I first saw it, it came shooting out from behind a box car, which stood on the track east of the main line. The first side track is about 8 feet east of the main line. There was no point, except the one point I have testified to, where I could see the main line north of the first box car. From the time I left the garage until I got onto the crossing I was watching all the way. When I got to the main line, a train shot out from behind a box car. I had my foot on the clutch and brake, and reversed the car the first thing I did. When I approached the track, I did all I could to stop, and reversed before I got to it. The train hit the front of the car. I didn't see the train until I was 8 or 10 feet from the main track. I was paying attention, and didn't hear the train whistle nor the bell ring. There was no signal at all.

On cross-examination:

The tracks of the defendant company are probably 210 feet from the door of my garage. The situation has been the same during the two years that I occupied the garage prior to the accident. During these years trains of the defendant railway frequently passed in both directions, and some of the trains, both passenger and freight, did not stop at Elma, and went through there pretty lively; but I seldom saw them go through so fast without giving any signal. I have at times seen both passenger and freight trains come into Elma

without giving signals, and trains go through the town quite rapidly. When I left the garage, I backed out and started—after I got turned around—up to the crossing. I started in low and intermediate, and went into high when I was 60 or 80 feet from the garage. The railroad crossing is some little distance elevated above the level of the road coming out of the garage, probably 4½ feet above the level of the road. The brakes were in perfect shape. After I got on my way towards the crossing in high speed, I was going probably about 10 miles an hour. When I got close to the track, I was going about 8 miles. The top was on the automobile, and it had a wind shield. The car made some noise. After I left the garage I saw that there was no train from the south, and was watching and paying all my attention for a train from the north, having in mind that a train might be along any time. If there are no box cars in the way, you ordinarily have a view down the road for half a mile. As I approached the crossing, I saw my view was obstructed. I kept on driving, with the idea that I could see through. There was an opening where I could see across the main line. It was probably 200 feet north of crossing. The opening was probably 10 feet. At that time I was about 80 feet from the crossing. I then proceeded on at 10 miles an hour, looking for another place where I could see, and found no other place, until I got within 10 or 15 feet of the track. I found no other place I could see through, until I was 8 or 10 feet or so from the track, running about 10 miles an hour. I saw the train when I was about 10 feet from the main track. I did everything I could to stop, but was not able to stop before getting on the main line. At the time of the accident I did not hear the train before I saw it. I did not hear any one call to me to look out for the train. It was a still day as far as I remember; there was no other noise about the yard as I started to cross the tracks, except the noise that the machine made and whatever noise the train made. I was listening as I approached the tracks, and did not hear the noise or rumbling of the train until it came out from the box car. As I approached the track I was trying all the time to get a view of the main line, and to see if a train was coming. I knew that, if a through train was coming, it would be on the second track. I was unable at any time to get a view of the main line until I was from 8 to 12 feet from the main line.

Mr. Oldham, who was riding with the plaintiff at the time of the accident, was called as a witness, and corroborated the testimony of the plaintiff. The plaintiff called also a number of other witnesses, who were in the village at the time of the accident, and who observed the approaching train. None of them heard the bell ring or the whistle sound. They estimated the speed of the train variously from 25 to 35 miles per hour. Some of them saw the train approaching, and all of them heard it.

Dan Conway testified that at the time of the accident he was at the east end of the Chapman Lumber Company's yards, about a block north of the crossing. He said:

"What attracted my attention to the train was the rumbling of it. I was about half a mile away from it."

Charles Keefe, who was about 100 feet south of the crossing as the train approached, testified:

"I saw the train and heard it, both."

Henry Heinemiller was in front of Miller's store, about two blocks north of the garage. He testified:

"The first I knew of the train was when it was up back of the stockyards a way, about three blocks from where I was standing. I heard it, but could not see it."

Richard Keefe, who was also at Miller's store, testified:

"When I first heard the rumbling of the train, it was about half a mile north."

Joe Biwer, a brother of the plaintiff, was at the garage at the time of the accident. He testified:

"I saw the smoke of the train back of the cement house. All I could see of the train was the smokestack. * * * When I first saw the train, I hollered to him [the plaintiff], 'Look out for the cars.' * * * There was no other noise at that time, besides the noise of the train."

John Mahoney was at the garage, and he testified:

"I heard the rumbling of the train. The first I could see of it was the smokestack, and smoke over the cement house. * * * It was the rumbling of it that attracted my attention. There was no other noise, besides the noise of the train. I suppose the automobile made a little noise. I heard the noise of the train above the noise that was made by the automobile. As the train approached the crossing, the noise of the train became louder."

On this appeal it must be assumed that the defendant was negligent in respect to some one or more of the matters charged in the complaint. The sole question for our determination is: Was the plaintiff himself negligent in not having his machine under such control that he could have stopped it before reaching the main line of defendant's railroad, and thereby have avoided the injury suffered by him, or was he at fault in failing to stop his car before reaching the main line of the railroad of the defendant company and listen for the oncoming train?

The cars standing upon the side tracks were in plain view of the plaintiff as he approached the crossing in his automobile. Except the one point testified to by the plaintiff, and referred to by other witnesses, where he caught a momentary glance of the track of the main line of the railroad, the view of the main line track was obstructed north of the south end of the car standing upon the cutoff track. Plaintiff did not rely upon the fleeting glance which he caught of the main line as he approached the crossing, for he testified that he continued to look, and as he drew near the crossing began to listen for the approaching train. He says that he listened and did not hear. It is a significant fact that the witnesses testifying in his behalf, some located north of the crossing, one south of the crossing, and some east of the crossing, all heard the approaching train, although it neither sounded its whistle nor rung the bell. Only the plaintiff and his companion, Oldham, failed to hear the rumbling of the approaching train. Assuming that they listened, as they testified they did, it must be that they failed to hear the approaching train because of the noise made by the automobile in which they were riding. The duty of the plaintiff in the premises is not an open question in this jurisdiction. Davis v. Chicago, etc., Co., 159 Fed. 10, 88 C. C. A. 488, 16 L. R. A. (N. S.) 424; Chicago, M & St., etc., Co. v. Bennett, 181 Fed. 799, 104 C. C. A. 309. The court in the Davis Case, supra, said:

"The duty to stop is a relative one. It depends upon the situation of the particular case, the knowledge the traveler has of the situation, and the reliance he may reasonably place under the circumstances on his opportunities for seeing and hearing without taking the last precaution of stopping. The authorities are quite in accord on the proposition that, if the view is unobstructed, so that an approaching train, before it reaches the crossing, can be seen, there is no occasion for the special exercise of the sense of hearing, listening, and therefore there is no reason why he should stop for that purpose. On the other hand, if the view is obstructed, interfering with the sense of sight, then he must bring into requisition the sense of listening carefully and attentively; and if there is any noise or confusion over which he has control, such as that of the noise of the horses' feet, or the grinding sound of the wheels, or the ordinary noise of the vehicle, interfering with the acuteness of the sense of hearing, it is his duty to stop such noise or interfering obstruction and listen for the train before going upon the track."

This court, in the Bennett Case, supra, quoted the above language with approval, and continued:

"The rule of law here announced is just and reasonable; it is supported, as the quotations in the opinion in that case show, by the decisions of the courts in Railroad Co. v. Hogeland, 66 Md. 149, 161, 7 Atl. 105, 59 Am. Rep. 159; Henze v. St. L., K. C. & N. Ry., 71 Mo. 637, 640; Blackburn v. Southern Pacific Ry. Co., 34 Or. 215, 55 Pac. 225, 229; Chase v. Railroad, 167 Mass. 383, 45 N. E. 911; Seefeld v. C., M. & St. P. R. Co., 70 Wis. 216, 222, 35 N. W. 278, 5 Am. St. Rep. 168; Shufelt v. Flint & P. M. R. Co., 96 Mich. 327, 55 N. W. 1013; Stepp v. Chicago, R. I. & P. Ry. Co., 85 Mo. 235; Merkle v. Railway Co., 49 N. J. Law, 473, 9 Atl. 680; and Denver City Tramway Co. v. Norton, 141 Fed. 599, 607, 608, 73 C. C. A. 1, 9, 10; and we are unwilling to depart from or relax it. If the plaintiff had stopped his horses just before he drove them into their dangerous position, stilled the noise of their feet, of the wagon, and of the brakes, and then listened, he would probably have heard the approaching train and have escaped his injury. If he had stepped off his wagon, and gone to the track before them, and looked to the east, he would certainly have seen the coming train. Looking where he could not see it, and listening while other noises prevented his hearing it, were futile. It is no more the exercise of ordinary care to look and listen, when and where looking and listening are useless, than it is to fail to look and listen, where looking and listening would be effective. The evidence of the contributory negligence of the plaintiff was conclusive in this case, and the court below should have instructed the jury to return a verdict for the company."

In addition to the authorities cited in the above quotation, the rule therein announced is supported by the following authorities: Askey v. C., B. & Q. Ry., 101 Neb. 266, 162 N. W. 647; Cathcart v. O. W. R. & Nav. Co., 86 Or. 250, 168 Pac. 308; Wash., etc., Ry. Co. v. Lacey, 94 Va. 460, 26 S. E. 834; Wehe v. Railway Co., 97 Kan. 794, 156 Pac. 742, L. R. A. 1916E, 455; Fluckey v. Southern Railway, 242 Fed. 468, 155 C. C. A. 244; Lancaster v. Foster, 260 Fed. 5, 171 C. C. A. 41; Rothrock v. Ala. G. S. Ry. Co., 201 Ala. 308, 78 South. 84; Rayhill v. Southern Pacific Ry., 35 Cal. App. 231, 169 Pac. 718; Robison v. O. W. R. & Nav. Co., 90 Or. 490, 176 Pac. 598.

The increasing use of the automobile upon our public highways, and the constantly recurring accounts of deplorable accidents resulting from collisions of automobiles with railroad trains upon public crossings, convince us that the rule of law announced in the

foregoing cases is reasonable, and one which should not be departed · from or relaxed.

The judgment is accordingly reversed, and the case is remanded to the District Court, with directions to grant a new trial.