Argued at Pendleton October 28, reversed with directions December 17, 1918, rehearing denied January 14, 1919.

## ROBISON v. OREGON-WASH. R. & N. CO.*

## CLIFFORD, ADMR., v. OREGON-WASH. R. & N. CO.

(176 Pac. 594.)

**Trial—Direction of Verdict—When Proper.**

1. Verdict cannot be directed, if there is any evidence sufficient to be submitted to the jury on the issue involved.

**Railroads — Crossing Accidents — Respective Duties of Railroad and Traveler.**

2. The duty of the traveler to use reasonable diligence to avoid a collision at a crossing is as imperative as the duty of those who operate the train, with the qualification that the train has the right of way where the track intersects the highway.

**Railroads—Crossing Accidents—Automobiles—Care Required.**

3. An automobile being capable of control within narrow limits, the driver of an automobile, on approaching railroad crossing, must observe more particularly the rule to look and listen than must a driver of a team.

**Railroads—Crossing Accidents—Duty to Look.**

4. Failure of a person, about to cross a railway track on a highway at grade, to look and listen for an approaching train, is negligence *per se*, and will bar a recovery for an injury received by a collision with a train at the crossing.

**Railroads—Crossing Accidents—Duty to Look and Listen.**

5. It is incumbent on an automobile driver, approaching a railroad crossing, both to look and to listen.

---

*For a review of the question of care required of driver of automobile at railroad crossing generally, see notes in 21 L. R. A. (N. S.) 794; 29 L. R. A. (N. S.) 924; 46 L. R. A. (N. S.) 702.    REPORTER.

Railroads—Crossing Accidents—Duty to Look and Listen.

6. Where view of railroad track from road was obstructed by bluff, it was the duty of an automobile driver to look for a train before going on the track.

Railroads—Crossing Accident—Contributory Negligence.

7. Driver of automobile, who approached railroad crossing at about 6 miles per hour without looking or listening, was guilty of contributory negligence when he failed to stop, if necessary in order to see approaching train, before going on track, and was killed by a train.

Negligence—Imputed Negligence—Driver and Occupant of Vehicle.

8. Whether automobile passenger was a guest, or was in partial control of the car, which was negligently driven upon the track and struck by a train, *held* for the jury.

Negligence—Imputed Negligence—Guest in Vehicle.

9. Negligence of the driver of an automobile is not to be imputed to a mere guest.

[As to negligence of driver of automobile as imputable to occupant, see note in Ann. Cas. 1916E, 268.]

Negligence—Imputed Negligence—Joint Adventure.

10. Negligence of the driver of an automobile, who negligently goes upon a railroad track, is to be imputed to one riding with him, who is his master or principal, in control of the machine, or if the passenger and the driver are engaged in a joint adventure, in which the transportation is a factor.

Negligence—Imputed Negligence—Jury Question.

11. Whether deceased automobile driver and injured passenger were engaged in joint adventure *held*, under the evidence, for the jury.

Evidence—Parol Evidence—Varying Writing.

12. It is permissible for a party to a written instrument to explain it and vary its terms, in litigation between himself and strangers to the document.

Negligence—Imputed Negligence—Joint Adventure—Requisites.

13. To establish a joint adventure between automobile driver and passenger, the passenger must have either express or implied right to direct the movement of the car.

Railroads — Crossing Accidents — Automobile Passenger—Rights and Duties.

14. Though passenger in automobile was merely a guest, it was his duty on approaching a railway crossing, to look and listen according to his opportunity, and, if he did not, he assumed the risk.

Negligence—Imputed Negligence—Exercise of Care by Plaintiff.

15. Assuming that an automobile passenger was a mere guest, negligence of the driver could not be imputed to him, if he was in the exercise of reasonable care under all circumstances.

**Railroads—Crossing Accidents—Instructions—Generality.**

16. In action for injuries and death at railroad crossing, instruction on care required *held* too general.

**Railroads—Crossing Accidents—Respective Rights.**

17. One in an automobile approaching railroad track cannot assume that the employees of the railroad have performed their duty until after he has effectively looked and listened without seeing or hearing an approaching train.

**Trial—Instructions—Assumption of Facts.**

18. Where suits of passenger in automobile and of the driver's administrator were tried together, requested instruction that, if either driver or passenger was guilty of negligence contributing to the accident, and without which it would not have occurred, verdict should be for defendant in both cases, was erroneous, as assuming that the relation of the occupants warranted imputing negligence of one of them to the other.

**Trial—Instructions—Assumption of Facts.**

19. Where suits of passenger in automobile and of the driver's administrator were tried together, requested instruction that, if collision with train happened wholly without the negligence of the passenger, he could recover, though the driver was negligent, was erroneous, as assuming that the driver's negligence could not be imputed to him.

**Damages—Instructions.**

20. In action for injury at railroad crossing, instruction on damages *held* not erroneous, though subject to criticism.

**Railroads—Crossing Accidents—Speed of Train.**

21. No rate of speed over a country crossing infrequently traveled is of itself negligence on the part of the railroad.

**Evidence—Presumption—Proper Conduct—Speed of Train.**

22. The law presumes that the usual rate of speed of trains over a given crossing is reasonable, and not negligent.

From Baker: GUSTAV ANDERSON, Judge.

In Banc.

Frank Weygandt and Alonzo V. Robison were driving together in an automobile, from Meridian, Idaho, to Battle Ground, Washington. They were compelled to travel on the county road in Baker County leading through the Burnt River Canyon. The defendant maintains its railway tracks through the same defile. Owing to the topography, the railway and highway frequently cross each other in that region.

Weygandt was driving the machine and at one of these crossings there was a collision between it and a freight train of the defendant, resulting in the death of Weygandt and the injury of Robison. The administrator of Weygandt brought action for damages accruing to the estate from the death of the decedent and the destruction of the automobile, and Robison brought action on his own account. By consent of the parties the cases were tried simultaneously before the same jury. The charge of negligence was four-fold, in substance: that the defendant failed to maintain a well-equipped warning-bell or other signaling device at or near the crossing; that it failed to warn the plaintiffs of the train's approach, by blowing a whistle or ringing a bell; that it did not keep a lookout on the train for the approach of the plaintiffs from the highway towards the crossing, and, lastly, that it operated the train at a dangerous rate of speed.

The charges of negligence and damages are traversed by the answers. Defending affirmatively, the answer to the complaint of Robison sets forth in substance that he and Weygandt were engaged in a joint enterprise; that the automobile was under their joint control, and, without stopping, looking or listening, without regard for their own safety or the safety of each other, they drove upon the railway track directly in front of the train, and that whatever injury either of them sustained was due to their own recklessness and carelessness.

As an additional defense to Robison's complaint, the answer sets up in substance that he was riding in an automobile driven by Weygandt, sitting by his side; that the plaintiff had assumed the duty of aiding the driver by keeping a lookout and that as the car was approaching the railroad crossing Robison negligently

failed to keep a careful or sufficient lookout and failed negligently to look for the train or to warn the driver of its approach, and permitted him to drive upon the track without stopping, looking or listening, so that whatever injury he sustained therein was due to his own negligence in that respect. The affirmative matter in the answer to the administrator's complaint is that Weygandt was operating the car himself and drove upon the track without stopping, looking or listening, so that his own negligence brought about the accident. The new matter in the answers was traversed. The trial resulted in verdicts and judgments for the plaintiffs, from which the defendant appeals.

REVERSED WITH DIRECTIONS.

For appellant there there was a brief over the names of *Mr. John F. Reilly, Mr. A. C. Spencer* and *Mr. James H. Nichols,* with an oral argument by *Mr. Reilly.*

For respondents there was a brief over the names of *Mr. Claud C. McCulloch, Mr. Oswald West* and *Mr. D. A. Norton,* with an oral argument by *Mr. McCulloch.*

BURNETT, J.—In the vicinity of the crossing the railroad track runs practically north and south. South of the crossing in question the county road runs toward the north, substantially parallel with the track on the west side thereof to a point near the crossing, when it passes eastward over the rails diagonally and continues on its northerly course again about parallel with the rails. The automobile was being driven toward the north and the train was proceeding south. About one thousand feet south of the crossing the wagon road passes over a hill from the summit of

which the plaintiff Robison says they could see the crossing and the track beyond that to the station at the village of Weatherby, except about one hundred and fifty to two hundred yards thereof next north of the crossing. He says that as they proceeded down the hill the view beyond the crossing was entirely obscured by an intervening point of a hill; that although they both looked and listened, and within sixty feet of the crossing slowed down the speed of the car to a rate not exceeding six miles an hour, they could not hear the train approaching or see it until the front of the machine was within three or four feet of the rails; and that the train was then coming at a good rate of speed, said by others to be twenty-five or thirty miles an hour, and struck the automobile about the front door on the left-hand side. Robison testified in substance that just as he saw the train he attempted to jump out of the car. The impact of the locomotive threw him upon the other side of the track and carried Weygandt and the machine about one thousand feet, killing him and wrecking the automobile. At the crossing was the usual cross-arm crossing signal inscribed, "Railroad crossing. Look out for the cars."

After leaving the crest of the hill, the wagon road descends until about three hundred feet from the crossing, it is lower than the railroad tracks and from there approaches the rails on a very slight ascending grade, but almost level. Other parties who were following in another car testified that they did not hear any noise of an approaching train or any whistle or bell. The trainmen and other witnesses attending a ball game near the station all testified that the engine bell was rung continuously from there to the crossing, and that the whistle was sounded not only for the approach to the station but also for the crossing. The train was

composed of fifty-two freight cars and was approximately half a mile long.

At the close of all the evidence the defendant moved the court to direct a verdict for the defendant in both cases, on the ground that the plaintiff had not offered sufficient evidence to entitle the cause to be submitted to the jury; that there had been no evidence of any negligence on the part of the defendant; that the plaintiff's decedent in the one case and the plaintiff himself in the Robison case, each was guilty of negligence contributing to his injury, and, finally, that the evidence considered in the light of physical conditions shows that if the precautions required by law had been observed, the travelers would have seen the approach of the train in time to avoid the accident, and that if they had listened they would have heard it in time to escape injury. The motions were denied and this is the principal error relied upon by the defendant. Some other questions are raised about the instructions to the jury, but we shall first consider the matter of directing a verdict.

1, 2. It is elementary that a verdict cannot be directed if there is any evidence sufficient to be submitted to the jury on the issue involved. The principal contention of the defendant under the motion is, as to Weygandt, that he was directly guilty of contributory negligence resulting in his death, and, as to Robison, that the negligence of Weygandt was imputable to him because they were engaged in a joint affair and likewise that he himself was negligent in failing to warn Weygandt of the train and the proximity of the crossing or to protest against his driving upon the track under the circumstances disclosed by the evidence. The duty of the traveler to use reasonable diligence to avoid a collision at a crossing is equally imperative

with that same duty incumbent upon those who oper-
ate the train, with the qualification that the train has
the right of way and the preference in passing the
point where the track intersects the highway.    Each
party owes this duty to the other as well as to the
traveling public that might be affected disastrously by
such a mishap.    To excuse a traveler from the harmful
consequences to which his own breach of this duty con-
tributes, would be to make of the company an insurer
against all and all manner of casualties, whether
caused in whole or in part by the fault of the injured
party, or not.    All the risk would be imposed on one
of the parties, whereas the law and reason say that the
reciprocal duty of reasonable care to avoid a collision
rests alike on both.    In most cases the question of
negligence is one of fact to be decided by a jury.    This
is taught by such cases as *Palmer* v. *Portland Ry., L. &
P. Co.,* 56 Or. 262 (108 Pac. 211).

Describing the collision, Robison testified as follows:

"Well, the best I can recollect, the way I know it,
the train was right there not more than, I guess, one
hundred feet, and we were so close to the track there
was not time to stop the car and not time to get across,
and the engine struck right on the front door on the
driver's side. * * I immediately dived for the door on
my side and just got my head under the top when it
hit."

"Q. Could you tell at what speed the train was trav-
eling?

"A. It was going at a good rate of speed."

Asked:

"Mr. Robison, will you tell the jury about how far in
feet it was from the crossing before you got beyond
the bluff so you could see the approaching train?"

He answered:

"It seems the front wheels of the car were within three or four feet from the rail, but we were sitting back further in the front seat."

The witness afterward said that the train was from eighty to one hundred feet distant when he had his first view of it.   We quote also the following from his testimony:

"Q. This was a calm, still day?

"A. Rather a calm day.

"Q. No wind was blowing at all?

"A. Not noticeably.

"Q. Your automobile was making no noise whatever?

"A. A very still machine.

"Q. You were running in low gear?

"A. We were running in high gear.

"Q. You were running and approaching that crossing four miles an hour on high gear?

"A. Yes, sir.

"Q. You are positive of that?

"A. Just as positive as I can be.

"Q. So there was nothing to attract your attention from your ability to hear sounds?

"A. Nothing.

"Q. And yet you heard no sound which indicated to you there was any person within a mile of you?

"A. No, sir.

"Q. You didn't hear any sound that indicated there was a ball game in progress at the depot?

"A. No, sir.

"Q. You didn't hear any sound there that would indicate there was any train in that neighborhood?

"A. No, sir.

"Q. From the time you came down the top of the hill until you came to this road crossing, you were running about fifteen or sixteen miles per hour, except the last hundred feet; is that right?

"A. Well, it might have been more than sixty feet. You always begin to slow down gradually.

"Q. I didn't intend to say one hundred feet. I understand you now that you testified you were running at the rate of four miles an hour, and not to exceed six, a distance of forty feet of the track?

"A. That is the statement I made.

"Q. Do you still subscribe to that statement?

"A. That statement is correct.

"Q. To return to the other matter; during the time that you were coming down the hill until you got within one hundred feet of the crossing, where you testified you started to slow down, you were running at the rate of fifteen or sixteen miles per hour; is that right?

"A. Practically at that speed. I cannot say, but the slowing down was done on a space of sixty feet.

"Q. Do you mean you could not slow down from fifteen miles an hour to four miles an hour in sixty feet?

"A. Why, a good driver doesn't do that.

"Q. Why can't any driver do it?

"A. A man can do it.

"Q. Ordinarily it is a fact drivers do it—slow down on a level road from fifteen or sixteen miles an hour to four miles, in sixty feet?

"A. I never thought I slowed down that quick.

"Q. Anyhow you were down to four miles an hour at forty feet?

"A. Yes, sir.

"Q. You were running fifteen or sixteen miles an hour most of the distance from the top of the hill until you got within one hundred feet of the crossing. All right. And you knew when you started down the hill there was some sort of a bluff there which made it impossible for you to see the first one hundred and fifty or two hundred yards of the track above the crossing at any time?

"A. Yes, sir.

"Q. Assuming now that this bluff of which you were talking about shut off the view so at any time on your journey from the top of the hill to the track you could not see any part of the track above the crossing, for a distance of one hundred and fifty to two hundred yards. That is your testimony, is it?

"A. Yes, sir.

"Q. All right, we will assume that it is the fact. Now you knew, then, at the time you approached this track, if there was a train anywhere in that one hundred and fifty or two hundred yards, or four hundred and fifty to six hundred feet, you would not be able to see it?

"A. I don't see how I could know it.

"Q. You knew, didn't you, there wasn't any place along in there that you could see that one hundred and fifty or two hundred yards of track?

"A. Yes, sir.

"Q. Therefore you knew at any time you were going along there a train might come on that track?

"A. Yes, sir.

"Q. You were not able to see it?

"A. Where we were then we knew we wasn't able to see it.

"Q. And there was no place anywhere until you got to the track?

"A. There was no way for us to know how close we would be to this track before the view opened in more and we could see.

"Q. You knew before you came on to the track that you were absolutely obstructed?

"A. Yes, sir.

"Q. Why didn't you stop?

"A. We listened and paid every attention, as well as we could, without stopping, and there was no whistle and no bell or anything.

"Q. Why was it when your view was shut off you didn't stop, so you could look? Do you mean you went on without trying and without looking—that you just depended upon your sense of hearing and didn't try to exercise your sense of sight, by stopping?

"A. We looked, but there was no place we could see anything.

"Q. You didn't have an engagement at Baker City within fifteen or twenty minutes after this time, and you were not in a hurry to get across the crossing?

"A. No; no hurry whatever.

"Q. You could have spent half a minute of time at that crossing, so you could have got out and looked?

"A. We could have.

"Q. So you could have stopped there and ascertained if the train was approaching, couldn't you?

"A. Yes, sir.

"Q. But you didn't do it?

"A. No, sir."

3. With respect to accidents at railway crossings, and as a sort of exception to the general precept that negligence is a question for the jury, the rule has been made more specific in detail on account of so many circumstances that are common to all such cases, so that what is required of the traveler has been concentrated into more exact statements than the mere generality that he must use reasonable diligence to avoid an accident. As the means of highway travel have been developed from conveyances drawn by cattle or horses into self-propelled vehicles, including the highly developed automobile, the rules are made still more precise, so as to correspond with the changed conditions. The modern automobile is a machine which may be controlled within very narrow limits. It may be run with safety very much closer to a moving train than would be prudent with a team of spirited horses. At the same time, when carelessly managed it may become an engine of great destruction, even to the possible derailment of a railway train. The situation when an automobile approaches a railroad crossing is only in degree different from that where the train of one railway is about to cross the track of another. The universal practice among railroad men is for the train to come to a full stop before crossing the other track. Of course, in the absence of legislation, we cannot impose so strict a rule upon the motorist, but the fact remains that the automobile and the locomotive are both self-propelled vehicles and it is but pressing the analogy a little to say they are both in a sense

railway trains. Considering their great flexibility of motion, and their great possibility of doing damage, it is but simple justice to demand of automobiles a more particular observance of the rule to look and listen than is required of the driver of a team of horses. On the one hand it is easier for the former to effectuate safety to all concerned, and on the other, neglect of duty is generally fraught with more serious consequences. It has always been the rule, crystallized into one of law, as stated by Mr. Justice BEAN in *Blackburn* v. *Southern Pacific Co.,* 34 Or. 215 (55 Pac. 225, 12 Am. & Eng. Neg. Cas. 515, 12 Am. & Eng. R. Cas. (N. S.) 461), thus:

"It is a principle of law, firmly established in this state as elsewhere, that the failure of a person about to cross a railway track on a highway at grade, to look and listen for an approaching train is negligence *per se,* and will bar a recovery for an injury received by a collision with a train at the crossing."

4. If from a place of safety on his way, the traveler in control of the vehicle in which he is riding can obtain a view of the coming train, he must look upon the course of the train from that point, and this responsibility is constant until the danger is past; that is, until he is safely across the railway track. The duty is constant because the danger is incessant. Instead of being intermittent it grows as the traveler gets near the crossing and reaches its climax only as he actually crosses the track in his passage. This obligation he owes not only to himself, but also to those on the train, whether passengers or the laborers employed in its operation. He must not allow his selfish little convenience to override this duty so well grounded in common sense.

5. All the precedents make it incumbent upon the traveler both to look and listen. Neither of them can

be eliminated without its use is practically impossible. The law does not excuse him from exercising both of them, unless there is no reasonable opportunity for that purpose. There is quite as much reason for his stopping so he can see as for stopping so he can hear, if there be any zone of safety from which he can see, and there are obstructions which prevent him from seeing a moving train without halting in that zone. As applied to Weygandt, the testimony on his behalf, in the light most favorable for his administrator, shows that while yet his car was three or four feet from the track the locomotive could be seen at a distance of from eighty to one hundred feet. Even that space would have been clearance sufficient to prevent collision. The locomotive, passing so near, would not have frightened or disturbed his machine as if it had been a spirited team he was driving. We are not deciding within how short a distance an automobile can be brought to a standstill from any given speed. We are only saying that with his car halted three or four feet out of the way of the locomotive a chauffeur safely may look at a train moving on the track before him. There was the railroad track almost in his face in open view. The crossing sign told him in plain language, "Look out for the cars." His own sight advised him from one thousand feet back that the crossing was there and that he would have to pass over it.

6, 7. The administrator claims his decedent could not see the train because of the intervening bluff. If this be true, how could he expect the trainmen to see him? If it was negligence for them not to see him under such conditions, it was equally negligent for him not to see the train they were operating. Looking at the impenetrable hill was futile. It was Weygandt's duty to look upon the only place whence the danger would

come, viz., upon the track, for which view he had safe and ample opportunity before going in front of the train: *Cathcart* v. *Oregon-Wash. R. & N. Co.*, 86 Or. 250 (166 Pac. 308). He was guilty of contributory negligence in not looking from that place of safety, stopping if necessary for that purpose, before advancing to the point of collision. His neglect of that duty cost him his life and his estate must bear the loss.

8. Robison's case differs somewhat from that of his father-in-law. There is evidence from which, if believed, the jury might find that he was a mere invited guest. On the other hand, the circumstances of their kinship by marriage and the fact that they were traveling together to visit their respective wives, mother and daughter, permissibly might lead the jury to conclude that the accomplishment of the journey was a joint venture in which both were equally interested. The court cannot say in this instance as a matter of law which was the true relationship between the two. That is a question for the jury.

9. Substantially the universal rule is that the negligence of the one operating a vehicle is not to be imputed to his companion who is only his guest. The law is thus epitomized in 22 R. C. L., 1049:

"If the occupant of a vehicle would avoid the imputation of the driver's negligence he must himself be free from negligence. Even a wife riding with her husband, or a daughter with her father, may have his negligence as driver imputed to her, if she is indifferent to her own safety. But what amounts to negligence the courts are not agreed upon. Some courts hold that it is the duty of the passenger to use reasonable care and judgment to learn of and avoid danger, so far as he has opportunity to do so. For example, when the conveyance is approaching a railroad crossing, he should look and listen for approaching trains, and, more than this, if he ascertains the presence of

danger he should inform the driver, and remonstrate with and check him in case he attempts to cross in the face of danger. A passenger who acquiesces in the reckless or negligent conduct of the driver on such occasions cannot recover from the railway company in the event of a collision with the cars. He should do all that a prudent and careful man would do under the circumstances, notwithstanding he has no authority or control over the driver. Some authorities have gone so far as to declare that it is no less the duty of the passenger than it is the duty of the driver to be on the lookout for danger and avoid it, but the better rule seems to be that, save in exceptionable cases, a passenger, whether for hire or not, and whether in a public or a private conveyance, should not be held to the same degree of watchfulness as the driver. The primary duty of caring for the safety of the vehicle and passengers rests upon the driver, and unless the danger is obvious or is known to the passenger, the latter may rely upon the assumption that the driver will exercise proper care and caution in approaching a place of danger. Of course, if the passenger knows that the driver is incompetent or careless, or sees that he is not aware of the danger and is not taking proper precautions, it is his duty to notify him of the danger; and a failure to do so is negligence. But ordinarily it is a question of fact for the jury, under all the circumstances, to determine whether or not the passenger was in the exercise of ordinary care."

In *Schultz* v. *Old Colony Street Ry. Co.,* 193 Mass. 309 (79 N. E. 873, 118 Am. St. Rep. 502, 9 Ann. Cas. 402, 8 L. R. A. (N. S.) 597), the syllabus reads thus:

"The negligence of the driver of a vehicle is not to be imputed to a guest riding with him gratuitously, and personally in the exercise of all the care which ordinary caution requires, so as to preclude the guest from recovering from a third person for personal injuries proximately resulting from his negligence."

In the note to *Rebillard* v. *Minneapolis, St. P. & S. S. M. Ry. Co.,* 216 Fed. 503 (L. R. A. 1915B, 953, 133 C. C. A. 9), it is said:

"By the great weight of authority the negligence of the driver of an automobile is not imputable to a guest or passenger riding in the machine, who has no authority or control over the machine or the driver, and this rule is applied in the following cases: (Citing a long list of precedents)."

On a superficial reading, the text in the Rebillard case would seem to be contrary to the doctrine of the note. The circumstances, however, were in substance that the owner of an automobile invited the plaintiff to take a trip with him. Shortly after they started the gas furnishing the lights of the machine gave out. After sundry efforts, the best they could do was to procure an ill-fitting wick for a small kerosene lamp attached to the car, which gave but very feeble light. Without protest on the part of the plaintiff they then proceeded in the dark over an unknown and but little traveled road, from which they finally strayed and ran over the embankment of a railroad cut which was hitherto unknown to any of the party, much less to the plaintiff. The negligence in this case was so flagrant and the acquiescence of the plaintiff in it so plain that in good reason he ought to have been held as a matter of law to have adopted the negligence of the driver. In the instant case there is evidence to the effect that Robison was looking and listening as carefully as if he were operating the car himself.

A case similar in some respects to that of Rebillard was *Winston's Administrator* v. *City of Henderson,* 179 Ky. 220 (200 S. W. 330, L. R. A. 1918C, 646). There two negroes in an evening of carousal got drunk and taking with them two colored women chartered an automobile which one of the men drove

on a joy ride with the other man, plaintiff's decedent, sitting in the front seat with him.   Due to the driver's carelessness resulting from his intoxication he ran the car into a ditch in the street which the city had left without adequate guards.   The machine was upset and the man seated with the driver was killed.   His personal representative was denied recovery because the decedent was negligent in trusting himself voluntarily with a chauffeur known to him to be incompetent by reason of drunkenness.

It is not practical to analyze all the precedents on this point.   It is sufficient to say of them that generally it will be found that the negligence of the guest himself was so marked as to amount to an adoption by him of the driver's recklessness.

10, 11. It may be set down, therefore, that a mere guest acting with due care himself is not to suffer by reason of the negligence of the driver.   On the other hand, the strong current of authority is to the effect that the negligence of the driver is to be imputed to one riding with him when he is a servant and the latter is his master, or when he is the agent for that purpose, in control of the machine, or, lastly, when they are at the time engaged in a joint venture or common enterprise in which the transportation is a factor.   As to the right to control the movement of the automobile, the defendant relies upon the fact appearing in evidence that at the time, and for some months previously, Robison held a bill of sale of the car from Weygandt; that the machine had been registered in his name in Idaho and even that he had presented a claim to the defendant for damages to it before bringing this action.   Robison, however, testifies that he himself had not a dollar invested in the car and that his father-in-law had given him a bill of sale of it so that he could

sell it for the account of Weygandt and give good title without having to consult the latter personally. At best, these features about the bill of sale, registration and claim for damages may be set down as contradictions of Robison's testimony to the effect that Weygandt was the owner of the machine, leaving the real truth on that point to be ascertained by the jury.

12. As to the bill of sale, it is permissible for a party to a written instrument to explain it and vary its terms in litigation between himself and strangers to the document: *Pacific Biscuit Co.* v. *Dugger,* 42 Or. 513 (70 Pac. 523); *Smith* v. *Farmers & Merchants' National Bank,* 57 Or. 82 (110 Pac. 410); *Zimmerle* v. *Childers,* 67 Or. 465 (136 Pac. 349).

As before indicated, it is plainly a question of fact whether Robison was purely a guest or whether he was engaged with Weygandt in a joint venture. It is difficult accurately to define the term for the purpose of the instant case and others of a similar nature. As said in *Withey* v. *Fowler Co.,* 164 Iowa, 377 (145 N. W. 923):

"It is somewhat difficult to state a comprehensive definition of what constitutes a joint enterprise as applied to this class of cases, but it is perhaps sufficiently accurate for present purposes to say that to impute a driver's negligence to another occupant of his carriage, the relation between them must be shown to be something more than that of host and guest, and the mere fact that both have engaged in the drive because of the mutual pleasure to be so derived does not materially alter the situation."

In *Schron* v. *Staten Island Electric Ry. Co.,* 16 App. Div. 111 (45 N. Y. Supp. 124), a father and son were engaged together in the work of moving some goods and employed for that purpose a wagon and team. While one was driving the team with the load and the

other was riding upon it, a collision between the outfit
and a street-car occurred, due to the negligence of the
driver.   In *Donnelly* v. *Brooklyn Ry. Co.,* 109 N. Y.
16 (15 N. E. 733), the plaintiff and another were re-
turning from delivering a load of fish and had on their
vehicle a stack of empty boxes.   By the driver's negli-
gence the plaintiff was hurt in a collision with the
street-car.   In the case of *Louisville & N. R. Co.* v.
*Armstrong,* 127 Ky. 367 (32 Ky. Law Rep. 252, 105
S. W. 473), two persons were hauling fodder together
when the team had a collision with a railway car, due
to the negligence of the one driving.   It was held in
*Alabama G. S. R. Co.* v. *Hanbury,* 161 Ala. 358 (49
South. 467), that a conductor and engineer in charge
of a train were engaged in a joint enterprise, with the
result that the negligence of one is imputed to the
other, who was injured by the collision of that train
with that of another road.

13.   In all these cases, however, there runs a vein of
common financial interest, indicating a *quasi* partner-
ship entailing the usual joint control.   This would
seem to furnish the ultimate distinguishing character-
istic of joint venture in such cases, which is none other
than the right, either express or implied, to direct the
movement of the vehicle employed in the transporta-
tion connected with the venture.   This must be so,
because fault in the operation of the vehicle is charged
as negligence.   In order, therefore, for the negligence
in that respect which was actually that of Weygandt
to be imputed to Robison, it being culpable operation
of the automobile, the latter must have had some au-
thority to direct the movement of the machine.

For the sake of brevity in terminology we may call
the supposed joint scheme a partnership.   If then it
shall appear either by direct testimony or by circum-

stantial evidence that the terms of this so-called partnership provide that each party to it may control the vehicle or direct its movements either constantly or alternately, the negligence of the one will be imputable to the other so far as it grows out of faulty management or operation of the machine of transportation. But if such control is outside the scope of the partnership or is vested exclusively in one of the members, imputed negligence in operation will not arise. The dilemma presents a mixed question of law and fact which must be left to the jury under proper directions in all cases where there is a dispute in the testimony or where reasonable men would fairly draw a different conclusion from the same evidence. Imputed negligence must be attributed to some fault in carrying out the provisions of the partnership.

It is only by virtue of some association such as we have pointed out that the negligence of Weygandt can be imputed to Robison to the latter's disadvantage, for, as said in Section 705, L. O. L.:

"The right of a party cannot be prejudiced by the declaration, act or omission of another, except by virtue of a particular relationship between them."

We may draw an analogy from the situation of the defendant in this case. Strictly speaking, there is no negligence of the company itself. It is penalized, if at all, only by the actual negligence of its employees in charge of the train. By virtue of their connection with the defendant their negligence is imputed to it. So here, Weygandt's imprudent handling of the automobile can be set down to the detriment of Robison only by virtue of one or more of the particular relations already mentioned. Whether they or any of them existed is a question of fact.

14. All this, however, does not excuse Robison from acting as a reasonably prudent man under the circumstances in looking out for his own safety. Although even a guest, as he neared the railway crossing it was his duty to look and listen according to his opportunity. If, with knowledge of the situation but without protest or warning he acquiesces in the negligence of the driver going into the danger by which he is injured, he adopts that negligence as his own. It is not imputed to him *nolens volens,* but on the other hand, he assumes it. The duty to look from where he can see and to listen from where he can hear is incumbent upon him as well as upon the driver where they have equal chance and if he does nothing to carry out this direction of the law he is negligent on his own account: *White* v. *Portland Gas & Coke Co.,* 84 Or. 643 (165 Pac. 1005). The question is a narrow one, whether Robison made proper and diligent use of the information he had about the conditions present. Weygandt was in the actual control of the machine. It is in evidence that he was an experienced driver; that he slowed down the speed to between four and six miles an hour as he approached the crossing. The jury had before it the question of whether Robison acted as a reasonably prudent man under those circumstances. It might consider he had a right to believe from Weygandt's retarding the motion of the automobile to the rate mentioned that he was going to stop before reaching the track. Some might say that Robison acted negligently in not demanding that the car be stopped further back; others might hold that as it was subject to such exact control it would be safe enough to go forward until the train would clear it only by a distance of three or four feet. The jury might have determined properly that considering his confidence in the skill of

the driver and influenced by his slackening the speed of the car, Robison had reason to believe that his companion would halt in a place of safety, so that without his fault the situation developed into one of sudden and imminent danger, somewhat clouding his judgment, and that his effort to escape by jumping out of the automobile was on his part the exercise of reasonable diligence to escape injury. All this is a question of fact for the jury in the Robison case, and as to him the rule denying the motion for a directed verdict was correct.

15. In brief, as to Robison, it was a jury question whether he was a guest or engaged in a joint enterprise, or had authority to control the movement of the machine. Negligence of Weygandt could not be imputed to Robison as a mere guest if the latter was in the exercise of reasonable care under all the circumstances. As a basis of imputing Weygandt's negligence to Robison it must be established as a matter of fact that the latter was in authority over the machine entirely or in part or was the principal to the former's servantship or agency, or that they were engaged in a joint enterprise. This basis should be left as a question of fact to the jury, and as to Robison's negligence, he being not in actual control of the machine, it was a question for the jury whether he knowingly acquiesced in Weygandt's negligence and adopted it, or whether he acted as a reasonably prudent man under all the circumstances.

It remains to consider the assignments relating to the instructions given and refused. In the eighteenth instruction the court charged the jury in part thus:

"The law assumes, and so must the traveler, that there is danger at a railroad crossing; and it is therefore an established rule of law that the traveler must exercise care and caution when approaching a railroad

crossing.   If a train is approaching and the traveler has knowledge thereof, or could have such knowledge by the use of his faculties and ordinary care, it is his duty to yield right of way and wait in safety until such train had passed.

"To this end the law requires that at such place as reasonable prudence and care would dictate to an ordinary prudent person so situated, upon seeing the railway crossing he shall look and listen, whether such signals or alarm be given or not, to ascertain whether any moving train is near.   He is required in such a situation to look and listen with intent and purpose of ascertaining whether such a train is approaching, and to then use reasonable care to take adequate precaution for his own safety. * * "

The twentieth instruction is here set down:

"Those operating a railway train are charged with and must perform the duty toward the traveler on the highway as I have defined that duty, and have the right in the absence of notice or knowledge to the contrary, to assume that the traveler observes and discharges his own duty such as I have stated; and, on the other hand, the traveler is charged with and must perform the duty of reasonable care for his own safety, and has a right to assume, in the absence of notice or knowledge to the contrary, that those operating the train perform their duty.   In other words, each is charged with the respective duties I have defined and in the absence of knowledge to the contrary, neither is bound to assume or anticipate or to act upon the assumption that the other will fail to perform such duty."

16.  The eighteenth paragraph of the charge is too general in its terms and leaves it open to be said, for example in the instant case, that the traveler's duty would be performed by looking for a train at the top of the hill mentioned, one thousand feet from the crossing, and then giving no further attention to the matter; whereas the true rule is that the obligation to look and

listen, and that, too, from points on the highway, if such there are, where the same may be effective, continues until the point of danger, namely, the crossing, is passed.   Respecting the twentieth instruction, the rule is thus laid down in 22 R. C. L. 1040:

"One approaching a crossing has a right to assume that the railway company will act with proper care, and that all reasonable and necessary signals of the approach of trains will be given; and in some jurisdictions it is provided by statute that a want of ordinary care will not bar a traveler in an action for damages against a railroad company, when the statutory signals are omitted.   But the general rule is that a traveler upon the highway approaching a railroad crossing has no right to depend solely upon any signals from a passing train, and must, in the absence of such signals, still exercise reasonable care for his safety, and endeavor to ascertain by looking and listening the actual fact whether or not a train is approaching, especially where his view is obscured; and whenever the due use of either sense would have enabled the injured person to escape danger, his failure to use it is conclusive proof of negligence, without any reference to the company's failure to perform its duty."

17. The precedents cited in support of the text all lay down the rule, in effect, that the traveler must first look and listen effectively without having seen or heard anything indicating the coming of a train, before he is authorized to assume that the company has performed its duty in that respect.   Inasmuch as the railway company has the right of way and priority of passage as against other vehicles using the public road at a crossing, the rights of a traveler on the highway and those of the company are not precisely identical. In the absence of anything to the contrary, those in charge of the train have a right to assume that the traveler will yield to it the preference and allow the

locomotive to pass the intersection first. The reason for this is found in the company's precedence in transit, which in turn is grounded on the right of eminent domain by which it acquired the right of way. On the other hand, to say to the traveler that he is not bound to act upon the assumption that the railway company will fail to perform its duty to warn him of the approach of the train, without reference to whether his absence of knowledge to the contrary was founded upon the performance of his own duty or not, is tacitly at least to invite him to act upon the mere supposition that the company is doing its duty. In that respect, the twentieth instruction was not altogether consistent with the clause in the eighteenth paragraph requiring the traveler to look and listen, whether other signals or alarm be given or not. It is only when he has first done what the law requires of him in the way of looking and listening, without seeing or hearing anything indicative of danger, that the traveler is authorized to assume that the passage is safe. The instruction as given practically eliminates the duty enjoined upon the traveler and allows him to act upon mere hypothesis. To permit him to rely upon such an assumption is in effect to introduce the doctrine of comparative negligence, at variance with the elementary rule that a plaintiff's contributory negligence will bar his recovery although the carelessness of the other party was a factor in the injury.

18. The defendant asked the court to say to the jury:

"If you find from the evidence that either of the occupants of said automobile was guilty of negligence which contributed to the accident and without which the accident would not have occurred, then your verdit should be for the defendant in both cases."

This request was properly refused, because it assumes that there was a relation between the two travel-

ers by which the negligence of one would be imputed to the other. But, as we have seen, there was evidence on both sides of that disputed question. Robison's doings about the car, already noted, if unexplained would authorize the jury to find that he was its owner with the right to direct its movements, which, if true, would impute to him the negligence of the man to whom he had entrusted the driving of it: *West* v. *Kern,* 88 Or. 247 (171 Pac. 413, 1050, L. R. A. 1918D, 920). On the other hand, if the jury found that the car was Weygandt's, entailing his right of control, his negligence would not be imputable to Robison on that ground. However, the court, speaking of the allegation that Robison had assumed but had failed properly to perform the duty of looking out, went on to say:

"If you find that such arrangement was made and that Robison failed to exercise such reasonable care and caution in his situation to look and listen, that by so looking and listening he could have learned of the danger and by warning to the driver could have avoided it, then, if such were the facts and that such neglect was a contributing cause of the accident, plaintiff cannot recover, even if he did not himself order the driver to drive on to the tracks of the crossing, but if Robison was not negligent or if no such negligence of his was such a contributing cause of the accident, then if the accident happened wholly without such omission or negligence of Robison, then he would be entitled to recover, even though the driver of the car was negligent. * * "

19. The error of this statement is the counterpart of the one in the defendant's request above quoted, in that it ignored the fact possibly deducible from the testimony, that Robison had the right to control the car, in which case though personally free from negligence, yet he would be charged by imputation with the negligence of the one to whom he had intrusted the driv-

ing of the car.   Throughout the charge the court left out of view the theory of the defendant that Robison had a right to control the automobile or that he and his father-in-law were engaged in a joint venture, both of which were allowably inferable from the testimony.

20. The defendant complains of the court's making this statement to the jury:

"If you find for Alonzo V. Robison, then it is for you further to determine from all the facts and circumstances in evidence what amount would be fair and just, and for that purpose you may then consider his age, his previous health and physical condition and impairment thereof, whether permanent or temporary, his earning capacity and impairment thereof, if any, like pain he may have suffered as a direct result of the accident, and in your verdict state the amount you find he would be entitled to as reasonable and just compensation for the injuries or loss he has sustained or in no event exceeding the amount demanded in the complaint."

In support of the exception to this charge we are cited to *Rugenstein* v. *Ottenheimer,* 70 Or. 600 (140 Pac. 747), the vice of the instruction in which was in this language, used by the court in directing the jury:

"Now, gentlemen, take the facts in this case—do what is right between the plaintiff and the defendant here without regard to anything except as your own conscience dictates.   Do this under the evidence and the rules of law as I have given them to you."

This was held to invite the jury into the field of conjecture without any restriction except its collective conscience.   While the instruction in the instant case is subject to criticism, its departure from the strict rule of the law to the effect that the damages must be limited to compensation for such injuries as were established by the evidence, is not so marked as in the precedent noted, and it is believed that upon a new

trial of the instant case like ground for objection may be avoided. Within the meaning of *Russell* v. *Oregon R. & N. Co.*, 54 Or. 128 (102 Pac. 619, 56 Am. & Eng. R. Cas. (N. S.) 497), neither the pleading nor the evidence makes a case requiring an automatic bell at the crossing in question and that ground of negligence involved in the want of such a signal should have been withdrawn from the jury by appropriate directions.

21, 22. Touching the accusation that the defendant was negligent in running its train at an excessive rate of speed its counsel asked the court to charge the jury thus: .

"In respect to the allegation of negligence in the complaint to the effect that defendant operated its train at a negligently high, dangerous and excessive rate of speed, I instruct you that no rate of speed over a country crossing such as the evidence shows the crossing in question to have been is of itself negligence. The requirements of industry and the convenience of the traveling public require that railroad trains shall be operated at high rates of speed and it is for you to say whether under the circumstances of this case the rate of speed at which you find that this train was operated was negligent, and if you find it to have been negligent whether such negligence was the proximate cause of the accident.

"In this same connection I instruct you that the law presumes the usual rate of speed to be a reasonable rate of speed and not to be negligent."

The trial judge not only refused these requests but also failed to give to the jury any directions whatever on that branch of the case. The two requested instructions last quoted are a fair exposition of the law as applied to this case and should have been given: 22 R. C. L. 1011.

The conclusion is that the judgment in each case must be reversed, with directions in the Weygandt case

to enter judgment for the defendant as upon a directed verdict in its favor; and in the Robison case, for a new trial of the issues involved.

Reversed With Directions.    Rehearing Denied.

Harris, J., absent.

Johns, J., took no part in the consideration of either of these cases.