Roy ADAMSEN, Appellant,

v.

ASBURY TRANSPORTATION COMPA-
NY, a Corporation, Appellee.

No. 17604.

United States Court of Appeals
Ninth Circuit.

Oct. 15, 1962.

Rehearing Denied Nov. 20, 1962.

Hess & Hess, Henry L. Hess, and Clay-
ton Hess, Portland, Or., for appellant.

Koerner, Young, McColloch & Dezen-
dorf, John Gordon Gearin and James H.
Clarke, Portland, Or., for appellee.

Before BARNES and JERTBERG,
Circuit Judges, and BOWEN, District
Judge.

JERTBERG, Circuit Judge.

Appellant (plaintiff below) a citizen of
the State of Oregon, instituted suit in the
district court against appellee (defend-
ant below), a California corporation, to
recover damages for personal injuries al-
leged to have been sustained in a rail-
road crossing collision when a passenger
train on which he was a passenger collid-
ed with appellee's tank truck and tank
trailer which was crossing the railroad
tracks. Jurisdiction of the district court
was properly invoked under Title 28 U.
S.C. § 1332.

Following trial to a jury, a general ver-
dict was returned in favor of appellee
and judgment upon the verdict was en-
tered in its favor. Following denial by
the district court of a motion for new
trial, appellant filed a timely appeal.
This Court's jurisdiction rests upon Title
28 U.S.C. §§ 1291 and 1294.

The accident occurred at a railroad
crossing located in an industrial area of
gasoline and oil storage plants near Port-
land, Oregon, at about 4:15 P.M. The
railroad crossing consisted of four sets
of tracks. The two inner sets of tracks
were for main line travel and on each
side of the main line tracks, and parallel
thereto, was a set of tracks used for
switching purposes. The tracks ran in
a general northerly-southerly direction.
Doane Street crossed the tracks in a gen-
eral easterly-westerly direction. The
railroad maintained at the crossing a
flashing red light "STOP" signal on each
side of the railroad tracks and an auto-
matic, continuously lit "STOP" sign on

the easterly side of the tracks and the southerly side of Doane Street, but no barrier, flagman, or two-train signal were maintained at the crossing.

The diesel tank truck and tank trailer had an overall length of 60 feet and its maximum speed was three miles per hour. At the time of the accident, the tank truck was loaded with gasoline and the tank trailer with diesel oil. It was being operated by an experienced, long-time employee of appellee. He was thoroughly familiar with the crossing. He had operated a tank truck and tank trailer over the crossing a number of times each day for a period of several years. Shortly before the accident the tank truck and tank trailer was traveling from east to west on Doane Street. Weather conditions were good.

As the operator of the tank truck and tank trailer approached the track crossing, a freight train traveling north on the most easterly set of the main line tracks was slowly crossing Doane Street. The flashing red light "STOP" signals were operating. The operator stopped the equipment behind two stopped automobiles. When the rear car of the freight train cleared the crossing, the two automobiles proceeded across the tracks followed closely by the tank truck and tank trailer traveling about three miles per hour. The flashing red light "STOP" signal on the westerly side of the crossing continued to operate. Because of switching operations of the railroad company, the "STOP" signals customarily operated day and night, "hour after hour," even though no train was approaching the crossing. When the freight train had cleared the crossing by an estimated 20 to 50 feet and the tank truck was on or approaching the second set of main line tracks, a passenger train was approaching the crossing from the north at a speed of about 35 miles per hour on the second set of main line tracks. The train's automatic air bell was continuously ringing and the whistle was being intermittently blown from about 1,000 feet north of the crossing but were not heard by the operator.

When the cab of the tank truck was on or near the first track of the westerly set of main line tracks, the operator first became aware of the approach of the passenger train which was traveling on the westerly set of the main line tracks. He made no attempt to speed up by shifting gears for fear of missing the gear. The engine crew of the approaching train saw the tank truck at a distance estimated by the engineer of two to three hundred feet, at which time the air brakes of the train were applied. The engine struck the tank trailer and stopped about 500 feet south of the crossing, with a portion of the rear car within the crossing.

Appellant was traveling as a passenger on the train. He testified that he was in a stooped position preparatory to getting his luggage and alighting from the train when the accident occurred, and that because of the emergency stopping of the train he was thrown to the floor and sustained the injuries of which he complains.

Although appellant noted seven specifications of error, only five are presented in appellant's brief. Of these, two relate to instructions refused, one to the denial of appellant's motion for new trial, one to the admission into evidence of a deposition taken by appellant of his attending physician, and one to the admission of evidence concerning appellant's retirement and characterization thereof by the district court.

The first alleged error concerning instructions of which appellant complains relates to the liability of appellee. Appellant contends that the court should have withdrawn from consideration by the jury the issue of appellant's negligence and should have instructed the jury that appellee, as a matter of law, was guilty of negligence proximately causing the collision, and leaving for consideration by the jury on the issue of liability only whether appellant suffered injury or damage proximately caused by the collision. An instruction offered by appellant so instructing was refused by the court.

Did the district court err? Appellee contends that the action of the district court must be sustained primarily on the authority of Fish v. Southern Pacific Co., 173 Or. 294, 143 P.2d 917 (1943), rehearing denied 145 P.2d 991 (1944); and Doty v. Southern Pacific Co., 186 Or. 308, 207 P.2d 131 (1949).

These decisions were construed by the Supreme Court of Oregon in McNealy v. Portland Traction Company, 213 Or. 659, 327 P.2d 410 (1958). In the course of the opinion that court stated (327 P.2d at pp. 412–414):

"Plaintiff urges that the strict rules relative to railroad crossing collisions have been abandoned, and that recent decisions of this court clearly demonstrate a retreat from the 'stop, look, listen and reconnoiter' standard and an embracing of the 'reasonable man' test in its stead. Citing Doty v. Southern Pacific Co., supra, and Fish v. Southern Pacific Co., 173 Or. 294, 143 P.2d 917, 145 P.2d 991. He maintains that the modern Oregon rule requires the traveler approaching a grade crossing to use only that degree of care which an ordinarily prudent person would use under the same or similar circumstances.

"A great many Oregon cases may be cited to support what plaintiff terms the 'strict rule' of contributory negligence. Andersen v. Southern Pacific Co., 165 Or. 368, 106 P.2d 1048; Stovall v. Portland Elec. Power Co., 127 Or. 518, 273 P. 701; Kirby v. Southern Pacific Co., 108 Or. 290, 216 P. 735; Robison v. Oregon-Washington R. & Nav. Co., 90 Or. 490, 176 P. 594; Cathcart v. Oregon-Washington R. & Nav. Co., 86 Or. 250, 168 P. 308; Hecker v. Oregon Railroad Co., 40 Or. 6, 66 P. 270.

"It is not necessary for us to set forth the facts in Fish v. Southern Pacific Co., supra, as they are fully set out in that opinion. It should be noted, in that case there existed at the railroad crossing conditions which made the passage over the tracks extra-hazardous, and this court relaxed the rule of law that a motor traveler at a railway crossing whose view of approaching trains is obstructed is required to stop his automobile at a safe place and 'go forward on foot to a point where an unobstructed view of the track may be obtained.' [173 Or. 294, 143 P. 2d 925.] To this extent this court overruled its previous expressions in Robison v. Oregon-Washington R. & Nav. Co., supra, and Cathcart v. Oregon-Washington R. & Nav. Co., supra. The court, however, approved its previous statement of the rule of law as to 'looking and listening' as set forth in the Robison case, 90 Or. at page 502, 176 P. at page 598:

" 'All the precedents make it incumbent upon the traveler both to look and listen. Neither of them can be eliminated, without (sic) its use is practically impossible. The law does not excuse him from exercising both of them, unless there is no reasonable opportunity for that purpose.'

"In Doty v. Southern Pacific Co., supra, we find another case where a traveler was injured at an extra-hazardous railway crossing where conditions then existing limited to a high degree the traveler's vision and hearing. The plaintiff was not required to leave her automobile and was only required to see what might have been seen therefrom, but we find nothing therein which detracts from the stated rule of law set forth in Robison v. Oregon-Washington R. & Nav. Co., supra, as approved in Fish v. Southern Pacific Co., supra, at a reasonably normal grade crossing.

"From a thorough consideration of all of these opinions, it is still the law of this jurisdiction that a traveler approaching railway tracks must, when there is a reasonable opportunity to do so, look and see what

is to be seen or be guilty of conduct barring his recovery.

\*   \*   \*   \*   \*   \*

"The plaintiff relies upon Doty v. Southern Pacific Co., supra, for his contention that a traveler approaching a grade crossing is required to use only that degree of care that a reasonably prudent person would use under the same or similar circumstances.

" 'A railroad crossing is an inherently dangerous place, and a traveler is bound to exercise care commensurate with the known hazards, and what it required depends upon the circumstances of each case. Courts are not at liberty to state, as a matter of law, that one must conduct himself in a particular manner in each case and under all conditions.' Doty v. Southern Pacific Co., supra, 186 Or. at page 333, 207 P.2d at page 141.'

We do not understand this statement to mean that in every action involving a collision between a traveler and a train at a grade crossing the test is what a reasonably prudent person would have done under the same or similar circumstances. This statement read in harmony with the facts and quotation taken from Grand Trunk Ry. Co., of Canada v. Ives, 144 U.S. 408, 417, 12 S. Ct. 679, 36 L.Ed. 485, can only be applicable when it appears from the evidence a traveler's vision of an approaching train is so limited by obstructions that reasonable minds may differ on whether or not under these circumstances a reasonably prudent person would have proceeded to the crossing, relying upon the use of his other senses to warn him."

In reference to the McNealy decision, appellee states in his brief that "Fish and Doty were held to have established the rule that there is no need to stop and reconnoiter, although the *duty to look and listen remains.*" (Emphasis added.)

The operator of the tank truck and tank trailer testified that as he proceeded across the tracks, he looked to his right but because his vision in that direction was obscured by the slow moving freight train, he did not see the approaching passenger train until the cab of the tank truck was on or near the first track of the westerly set of main line tracks. If the only duty which the law placed upon the operator was to look, we would concede " \* \* \* that reasonable minds may differ on whether or not under these circumstances a reasonably prudent person would have proceeded to the crossing, relying upon the use of his other senses to warn him." McNealy v. Portland Traction Company, supra, 213 Or. 659, 327 P.2d at page 414.

If the operator's failure to see had been solely caused by blacked out windows in his cab which prevented him from seeing anything outside of the cab, could it be said that unusual conditions at the crossing excused him from the duty to look? We believe not.

As we construe the law of the State of Oregon, there is placed upon a motorist crossing or proceeding to cross a railroad crossing, not only the duty to look but also to listen. McNealy v. Portland Traction Company, supra; Schwesinger v. Hebert, 220 Or. 149, 348 P.2d 249 (1960). Such is also the view of the able District Judge who presided at the trial as reflected in his instructions to the jury. On this subject the District Judge stated in part:

" \* \* \* it is the law of this State that the exercise of ordinary and reasonable care on the defendant's part requires that the defendant before proceeding onto the crossing had the duty to look and listen for approaching trains, and the duty in this regard was to look from a place from which the defendant could see and listen, from a place where the defendant could hear, and if some obstruction prevented the defendant's driver from obtaining such a view, or extraneous noises prevented the driver from so listening,

then it would have been the driver's duty to stop and wait until such a view could be obtained [f]or to look from a place where a proper view could not be had, or to listen from a place where to do so would be unavailing, is not performing the duty of looking and listening which is required by law.

\* \* \* \* \* \*

"The duty of the defendant driver to listen for an approaching train, which has heretofore been mentioned, is the duty to give close attention for the purpose of hearing what is to be heard, with the further purpose of stopping and giving the right-of-way to any train approaching along the track which could be heard by so listening. The performance of this duty is required at the time and place necessary in the exercise of reasonable ordinary care and is especially to be emphasized where the traveler is familiar with the crossing and particularly so where for any reason the view is obstructed and yet familiar area.
\* \* \*"

There is no conflict in the evidence that the train's automatic air bell was continuously ringing and the whistle was being intermittently blown from about 1,000 feet north of the crossing. The operator testified that he did not hear these warnings of an approaching train although he does not deny that they were given. There is nothing in the record which even remotely suggests that his failure to hear was occasioned by extraneous noises or other unusual conditions surrounding the crossing.

On direct examination the operator testified as follows:

"Q. What is the maximum rpm to which your truck is governed? A. 2100.

"Q. At 2100 rpm—incidentally, is this a gas rig or a diesel? A. Diesel.

"Q. At 2100 rpm, wound up to its maximum to which it is govern-ed, how would you describe the noise that your motor makes. A. Oh, it's rather noisy.

"Q. When you say 'rather noisy,' I wonder if you could clarify it a bit. Would it be difficult to hear something else outside of your cab? A. Yes, it would.

\* \* \* \* \* \*

"Q. (By Mr. Clayton Hess): Well, now, from the time you first started your vehicle from a position 40 feet back of the first track, did you open it wide open to the 2100 rpm when you first started? A. Yes.

\* \* \* \* \* \*

"Q. Being abundantly familiar with that crossing, would you say it's a busy crossing? A. Yes.

"Q. You knew at the time you started across it that trains were apt to be passing there at any time, did you not? A. Yes.

\* \* \* \* \* \*

"Q. (By Mr. Clayton Hess): Well, being familiar with that crossing, you were aware that a train might be coming from either direction at any time, were you? A. Yes."

On cross-examination the operator gave the following testimony:

"Q. Did you hear a train that afternoon? A. No."

On redirect examination appears the following:

"Q. (By Mr. Clayton Hess): You say you didn't hear a train. Did you listen for a train?

"A. Couldn't hear it.

"Q. Because of the noise you were making?

"A. The motor, right.

"Q. When you say that you didn't hear a train, you're not saying that no whistle was blown or no bell was rung, are you? A. No."

Did the operator discharge the duty placed upon him to listen? We be-

lieve that under Oregon law, a motorist who proceeds across a railroad crossing when his own vehicle is making so much noise that he can hear no noise or warnings from outside of his cab, is in no different position than a motorist who makes the same journey without listening. In both instances he has failed to discharge one of the duties placed upon him under the law of the State of Oregon. May such failure be excused because the jury may have found the crossing to be one of unusual hazard? We find nothing in the record indicating that any fact, condition or circumstance surrounding the crossing or the accident in any manner, or to any extent, caused or contributed to the failure of the operator of the tank truck to hear the warnings given by the approaching train. Such failure was caused solely by the noise made by the tank truck and its motor. If the failure of the operator to hear the warnings emitted from the approaching passenger train had been caused by extraneous noises—such as, for example, noises made by other trains in the area or other vehicles in the crossing or by nearby industrial establishments—it might be argued that reasonable minds might differ whether or not under these circumstances a reasonably prudent person would have proceeded to the crossing, relying upon the use of his other senses to warn him. Such reasoning, however, is not applicable to the failure to discharge a duty imposed by law when such failure is unrelated to any unusual circumstance or condition surrounding the crossing or the accident.

We are constrained under the facts and Oregon law as we understand it, to hold that the district court erred in refusing the requested instruction. In addition to cases cited, see also Murphy v. Southern Pacific Co., 223 Or. 522, 355 P. 2d 236, 238; and Bass v. Southern Pacific Co., 196 F.Supp. 763 (1961) (D.C. Or.).

The judgment is reversed and the cause remanded to the district court with instructions to grant appellant a new trial limited to the issue of whether or not appellant suffered injury or damage proximately caused by the collision, and to the issue of damages.

We deem it unnecessary to pass upon the assigned error relating to the admissibility of the doctor's deposition. Appellant's counsel conceded at oral argument that because of the intervening death of the deponent, such deposition would be admissible in the event of a new trial. We likewise deem it unnecessary to pass upon the admissibility of evidence relating to appellant's retirement since that subject may or may not appear, or appear in different form, on the new trial.