## TRENHOLM v. SOUTHERN PAC. CO.

(District Court, D. Oregon. February 16, 1925.)

No. L–9458.

1. Railroads ⚖=327(12)—Passengers in automobile must look and listen at crossings.

It is the independent duty of each passenger in an automobile on approaching a railroad crossing to look and listen, and if a passenger, with knowledge of the situation and without protest or warning, acquiesces in the negligence of the driver he adopts that negligence as his own, and if injured as its result he cannot recover therefor.

2. Railroads ⚖=327(12)—Passenger in automobile held negligent at crossing.

A railroad company *held* not liable for the death of a young woman, who was killed at a crossing while riding in an automobile without side curtains, driven by her father, where all those in the car had a clear view of the track in the direction from which the train approached for three-quarters of a mile from the crossing, from the time they reached a point 800 feet distant.

3. Railroads ⚖=324(1) — Crossing notice of danger.

A railroad crossing is in itself a notice and warning of danger, and the railroad has the right of way, and of this the traveling public on the highways must take cognizance and be governed accordingly.

At Law. Action by D. P. Trenholm, administrator of the estate of Ada Clare Trenholm, deceased, against the Southern Pacific Company. On motion by defendant for directed verdict. Granted.

Vinton & Tooze, of McMinnville, Or., for plaintiff.

Ben C. Dey and C. J. Young, both of Portland, Or., for defendant.

WOLVERTON, District Judge. On the evening of May 29, 1924, at about the hour of 7:30 o'clock, while the Southern Pacific electric red car train (two cars in the train) was traveling southward, and at a point about one-fourth of a mile north of the city limits of McMinnville, it came into collision with plaintiff's automobile at the crossing of the railroad track with the West Side Pacific Highway, upon which plaintiff was traveling at the time, resulting in the wrecking of plaintiff's car and the death of his daughter, Ada Clare Trenholm. Although plaintiff is suing in the capacity of administrator of the estate of his deceased daughter, I have heretofore spoken of him as an individual, not respecting his administrative capacity.

D. P. Trenholm was traveling at the time, accompanied by his wife and three daughters; he sitting on the left-hand side of the car, at the wheel, and his wife on his right in the front seat. His daughters were occupying the back seat, the deceased on the right, a mere child (a girl of ten) in the middle, and another daughter on the left. The deceased was 17 years of age and past. The other daughter was older than she. The railroad track crosses the highway at rather an acute angle, so that one traveling in an automobile, if paying attention to the surroundings, would become aware of the existence of the railroad some time before reaching the crossing. The left side of the automobile was nearest the railroad before crossing the track. The right-hand side afforded, therefore, the better view of the line looking to the fore and beyond the crossing. The crossing was well known to Trenholm. There was situated at the crossing the usual crossing sign, and also a sounding gong or bell, plainly visible for a considerable distance to one approaching the crossing. Plaintiff's car was a Chevrolet, and at the time was without side curtains.

Trenholm testifies, in effect, that when he came on top of the hill at the Miller house he could see the crossing clearly and the warning bell post; that he was traveling on the right-hand side of the road; that the arms were not moving, nor the bell ringing; that he decreased the speed slowly as he neared the railroad track. "When I came on top of the raise," he says, "where I could see—have a good view—I looked to the north and east along the track. I saw no train, and I looked to the crossing, and the warning bell was not ringing, nor the arms moving. I drove on, and turned and looked to the left; and on that side the view was not so clear—it was obstructed by houses, buildings. And at the acute angle that the railroad and highway intersects, it made it necessary to turn around almost back to

see back along the railroad track, to see if there was a train coming in from that side. I saw nothing on that side, and heard nothing. So I turned and looked ahead. There was no warning bell ringing, nor arms moving. I looked to the right again, and I saw nothing. I was then about where the Albers sign would obstruct my view. As the warning bell was not ringing, I drove on toward the track. After we had passed beyond the Albers sign toward the track, my little girl that was killed said, 'Oh, daddy, there's the train.' And I didn't know which way the train was coming. I looked first to the left—I didn't see it; and then I looked back to the right and saw the train, and set my brake. And, looking ahead, it appeared to me that there was room to stop before I reached the railroad track; but, on account of the acute angle, my left wheel was much nearer the track than the right-hand side, so I discovered that I was going to be unable to stop before I reached the railroad track, and it was a choice between a collision or making it across. I released my brake, and shot across the track as fast as I could make the car go."

He further testified that he was probably 40 feet from the intersection when his daughter said, "Oh, daddy, there's the train," and that the train at the time was about 150 feet distant—he could not tell exactly. He did not know whether the train blew the whistle or rang the bell. He was, at the time he came in view of the crossing, driving at the rate of about 25 miles per hour. When within probably 200 feet of the crossing, he reduced the speed to about 20 miles. There was no further reduction until he set his brake. "I set the brake, and released it immediately," he says; "I think it reduced the speed to probably 15 miles." When asked how far he was away from the crossing when he set his brakes, he answered, "Well, at the angle there it is hard to say just how far I was from the crossing. Looking straight ahead, it seemed about probably 20 or 30 feet, but on the left-hand side it was nearer." He says further that, after looking to the left and then to the right again, he was probably 20, possibly 25, feet from the crossing, and the train, according to his judgment, was about 60 or 70 feet away. After releasing his brake, he supposes that his car increased to 25 miles per hour by the time the train hit it.

It is practically admitted that the Miller house is situated 800 feet from the crossing, and that the train could be seen, by one looking for it, at the distance of about three-quarters of a mile, or, as it was more specifically estimated, 4,200 feet. There was a direct view looking ahead, especially to those on the right-hand side of the car, across open fields, with no physical obstructions of moment, except the Albers sign, which was near the crossing, and that obstruction was momentarily to the vision as the car passed along.

This fairly presents the situation and conditions with sufficient fullness and accuracy for determining the crucial question arising upon defendant's motion for an instructed verdict. Were Trenholm himself suing for damages accruing to his person or automobile, there could scarcely be a doubt that he would not be entitled to recover, and this because of his own negligence which conduced to the injury. If it be admitted that the sounding gong was not ringing, nor its arms moving, the opportunity of observing the approach of the train was so patent and obvious that he cannot be excused for not having seen it in more than ample time for obviating the collision. And he should have seen it, and acted accordingly, and thus have avoided the accident.

[1] The rule as settled by the great weight of the authorities is that his negligence is not imputable to his daughter, for whose death he is suing as administrator. A duty, however, devolved upon the daughter, altogether her own, wholly aside from any imputed negligence of the father. The duty, and the rule governing it, cannot be better stated than it is in Robison v. Oregon-Wash. R. & N. Co., 90 Or. 490, 511, 176 P. 594, 601, by Judge Burnett. He says:

"Although even a guest, as he neared the railway crossing it was his duty to look and listen according to his opportunity. If, with knowledge of the situation, but without protest or warning, he acquiesces in the negligence of the driver going into the danger by which he is injured, he adopts that negligence as his own. It is not imputed to him nolens volens, but, on the other hand, he assumes it. The duty to look from where he can see, and to listen from where he can hear, is incumbent upon him as well as upon the driver, where they have equal chance, and if he does nothing to carry out this direction of the law he is negligent on his own account."

The doctrine here enunciated has the absolute approval of the federal courts. Bradley v. Missouri Pac. R. Co., 288 F. 484, a case decided by the Circuit Court of Appeals of the Eighth Circuit. The opinion is very exhaustive, and reviews many au-

thorities. I allude simply to one quotation made therein from Brickell v. N. Y. C. & H. R. Co., 120 N. Y. 290, 293, 24 N. E. 449, 450, 17 Am. St. Rep. 648, as showing the trend of judicial thought, namely: "It is no less the duty of the passenger, where he has the opportunity to do so, than of the driver, to learn of danger and avoid it if practicable." This is sufficient to demonstrate that the duty is an active one, and not merely passive, depending upon the driver's judgment and skill for safe carriage.

[2] The daughter was of the years of full discretion. Many young women of her age drive and operate cars, and are well aware of the dangers incident to the operation of an automobile upon the public highways and at railroad and other crossings. She, sitting on the right-hand side of the car in the back seat, had as clear a view of the railroad track ahead as any of those in the car, and should have seen the approaching train long before she gave the warning to her father, and her warning should have been timely. If it had been so given, there would have been no trouble with the train. The one given was not timely—it was most untimely. It served, when given, to confuse her father, and his confusion, I have no doubt, led to the accident, for, if he had continued at the pace he was going, hazardous as it was, in all probability he would have passed ahead clear of the train. It was probably the check he gave to his car by setting the brakes that was the instant cause of the accident.

The duty thus imposed upon the guest is a humane one. It is not alone for his own personal benefit, but is one owed to the public and to other persons directly associated with him in traveling upon the highway, and even to the railroad company, using the crossing with its trains, for the neglect of such duty might wreck a train as well, with great injury to its passengers.

[3] A railroad crossing is within itself a notice and warning of danger, and the railroad has the right of way, and of this the traveling public on the highways must take cognizance and be governed accordingly. It is my opinion that none of the persons in the car were paying that attention to the exigencies of the case that they should have been, the child excepted. Three of them were in excellent position to observe and note the approach of the train a considerable time before it was apparently discovered. The very nature of the warning given was expressive of very present peril—

"Oh, daddy, there's the train!" It was an exclamation, an ejaculation, and it was, in all probability, that that confused the father —the suddenness of it. The condition of imminent peril was one brought on by the want of ordinary care, prudence, and circumspection, especially of the three persons in the car who could have seen, but failed to see and observe, and it was that which was the proximate cause of the unfortunate accident.

There was no incident disclosed by the evidence tending to indicate that the railroad company was guilty of gross negligence. The motion for a directed verdict will therefore be sustained.

This renders it unnecessary to discuss the question as to whether, under the evidence, any basis was shown upon which to predicate damages.